140 P.3d 401

**Alexander MALAHOFF; Linda Currivan; Diane Ferreira; Hugh Folk; Vincent Linares; David Miller; and University of Hawai'i Professional Assembly, Plaintiffs–Appellees,**

**v.**

**Russ K. SAITO, in his capacity as Comptroller of the State of Hawai'i; and Linda Lingle, Governor of the State of Hawai'i,[1] Defendants–Appellants.**

**No. 25180.**

Supreme Court of Hawai'i.

Aug. 11, 2006.

As Corrected Sept. 19, 2006.

1. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c) (2004), Russ K. Saito

and Linda Lingle have been substituted as parties to the instant appeal, in place of Raymond H. Sato and Benjamin J. Cayetano, respectively.

Kathleen N.A. Watanabe and Gary Hynds, Deputy Attorneys General, on the briefs, for defendants-appellants, on the opening brief.

James E. Halvorson and Sarah R. Hirakami, Deputy Attorneys General, on the briefs, for defendants-appellant, on the reply brief.

T. Anthony Gill and Wade C. Zukeran (of Gill & Zukeran), Honolulu, on the briefs, for plaintiffs-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; ACOBA, J., concurring and dissenting separately.

Opinion of the Court by MOON, C.J.

This appeal arises from the efforts of defendants-appellants Russ K. Saito, in his capacity as Comptroller of the State of Hawai'i (the State), and Linda Lingle, in her capacity as Governor of the State [hereinafter, collectively, the Defendants] to implement the new payroll payment plan provided in Hawai'i Revised Statutes (HRS) § 78–13 (Supp.2005), quoted *infra,* as to the faculty members at the University of Hawai'i [hereinafter, UH faculty or UH faculty members]. Under the new payment plan—described in the pleadings as "the payroll lag,"—pay dates would change from the fifteenth day and last day of the month to the fifth and twentieth day of the month, which change has been effectuated with respect to other State employees.

Briefly stated, plaintiffs-appellees Alexander Malahoff, Linda Currivan, Diane Ferreira, Hugh Folk, Vincent Linares, and

David Miller,[2] as well as the UHPA[3] [hereinafter, collectively, the Plaintiffs], the exclusive collective bargaining representatives of the UH faculty members, initially challenged the amended statute in the United States District Court for the District of Hawai'i (U.S. district court), contending that the implementation of the lag was in violation of the Contract Clause of the United States Constitution.[4] The U.S. district court thereafter issued a preliminary injunction against the Defendants from imposing HRS § 78–13 upon the Plaintiffs; the United States Court of Appeals for the Ninth Circuit (the Ninth Circuit) affirmed the issuance of the injunction. However, after the collective bargaining agreement between the UH faculty and the Defendants expired, the U.S. district court dismissed the case as moot, thereby lifting the injunction. Thereafter, the Defendants again sought to implement the payroll lag plan as to the UH faculty members, but were enjoined from doing so by the Circuit Court for the First Circuit, the Honorable Victoria S. Marks presiding. The circuit court eventually issued a permanent injunction that is the subject of this appeal.

The Defendants now appeal from the circuit court's first amended judgment, challenging the circuit court's order denying the Defendants' motion for judgment on the pleadings and the order granting the Plaintiffs' cross-motion for summary judgment and the permanent injunction. The Defendants essentially contend that the circuit court erred in its statutory interpretation of HRS § 78–13 and in failing to rule upon the constitutional violation issue raised by the Plaintiffs.

For the reasons more fully discussed *infra*, we affirm the June 7, 2002 first amended judgment.

## I. *BACKGROUND*

### A. *The First Amendment to HRS § 78–13 (Act 80)*

Historically, all State employees, including UH faculty members, were paid semimonthly, pursuant to HRS § 78–13 (1993), and received their paychecks on the fifteenth day and the last day of each month based upon a "predicted payroll" system. HRS § 78–13 provided:

> **Salary periods.** Unless otherwise provided by law, all officers and employees shall be paid at least semimonthly except that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month.

(Bold emphasis in original.) (Underscored emphasis added.) Thus, under the predicted payroll system, State employees were paid (1) on the fifteenth for work performed from the first to the fifteenth of the same month and (2) on the last day of the month for work performed from the sixteenth to the end of the same month.

> **§ 89–8 Recognition and representation; employee participation.** (a) The employee organization which has been certified by the board as representing the majority of employees in an appropriate bargaining unit shall be the exclusive representative of all employees in the unit. As exclusive representative, it shall have the right to act for and negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership.

(Bold emphasis in original.)

---

**2.** Malahoff is a member of the UH faculty and serves as a director and president of the University of Hawai'i Professional Assembly (UHPA). Currivan is an associate professor at Leeward Community College. Ferreira is a professor at Hawai'i Community College and a director of the UHPA. Folk is a professor at UH–Manoa and a director and treasurer of the UHPA. Linares is an associate professor at Maui Community College and a director of the UHPA. Miller is a professor at UH–Hilo and is a director and member of the UHPA's executive committee.

**3.** The UHPA is the labor organization certified under HRS § 89–8 (1993) to represent the UH faculty. This faculty bargaining unit, Unit 7, consists of approximately 3,100 persons who perform teaching, research, or related duties throughout the UH campuses at Manoa, Hilo, West O'ahu, and the community colleges. HRS § 89–8 provides in pertinent part that:

**4.** Article I, Section 10, Clause 1 of the United States Constitution provides that: "No State shall ... pass any ... Law impairing the Obligation of Contracts[.]"

In 1996, the State began to examine various solutions to address the bleak fiscal conditions in its general fund balance.[5] Among the many proposals to reduce expenditures and increase revenues was a plan to implement a one-time payroll lag in fiscal year 1997 that was anticipated to result in a one-time savings of $47 million. Under the proposal, the pay dates for all public employees would be delayed gradually over a span of approximately four months until the pay dates fell on the fifth and twentieth day of the month. The resulting effect was that the paycheck that would have been paid on June 30 (the last day of the fiscal year) under the predicted payroll system would be paid out on July 5 (in the next fiscal year) under an after-the-fact or payroll lag system, which was the basis for the anticipated savings referred to above.[6] The proposed plan was deemed to be "the least drastic measure to realize a savings of $47 million because it required no reduction in programs, no further reduction in personnel, and no increase in taxes." [7]

On June 5, 1996, HRS § 78–13 was amended via the passage of Act 80 [hereinafter, HRS § 78–13 (Supp.1996) or the Act 80 amendment], which authorized the governor to convert the predicted payroll system to an after-the-fact payroll system. 1996 Haw. Sess. L. Act. 80, § 1 at 103. The Act 80 amendment provided as follows:

**Salary Periods.** Unless otherwise provided by law, all officers and employees shall be paid at least semimonthly except that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month <u>and that the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll, may allow a one-time once a month payroll payment to all public officers and employees to effect a conversion to after-the-fact payroll; provided that the conversion time schedule shall occur over one-year period.</u>

5. The State had abolished 1,170 positions, approximately half of which were filled, and then imposed a general freeze on filling vacant positions. Nevertheless, the fiscal condition of the State general fund continued to worsen with the projected budget deficit continuing to grow. Because of this crisis, the executive branch proposed to the legislature that a cut in general fund appropriations of $135.5 million be made in fiscal year 1996. For fiscal year 1997, the budget was cut by a net of $135.6 million. The executive branch's financial plan projected a balance of $15.5 million at the end of fiscal year 1996 and a shortfall of $143 million at the end of fiscal year 1997. To address the worsening fiscal condition, the administration implemented several additional proposals to deal with the anticipated shortfall, including the federal maximization project, which involved hiring a consultant to obtain additional funds from the federal government, additional budget restrictions, and a repeal of tax credits.

6. As explained by the Ninth Circuit in *University of Hawai'i Professional Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir.1999):

A predicted payroll requires state agencies to assume or predict their employees' rate of absenteeism during an entire pay cycle. An after-the-fact payroll system pays employees only for time already worked, eliminating the overpayment problem. The problem with a predicted payroll is that[,] if employees failed to

report to work and had insufficient leave to draw against, overpayment results. The changeover from a predicted to an after-the-fact payroll system was to have been accomplished, according to the [1996 amendment to HRS § 78–13], by implementing "a one-time once a month payroll payment to effect the conversion[.]"

*Id.* at 1099 (some brackets and ellipses omitted). Thus, under the predicted payroll system, an employee might receive pay for which he or she is not entitled if that employee's status changes after the submission of the payroll information, *e.g.*, an employee is terminated or has exhausted his or her leave benefits. The Defendants assert that the overpayment of employees is a major problem for the State and that the chances of overpayment would be reduced with an after-the-fact payroll because "the delay in pay days would provide more time in which to process payroll transactions to reduce the problem of overpayments to employees."

7. "[A]s a cushion against economic downturns and unexpected expenses," the desired year-end budget surplus was estimated at $155 million (representing five percent of appropriations). Although the implementation of the payroll lag proposal would yield year-end balances for fiscal years 1996 and 1997 of only $62 million and $60 million, respectively, it was anticipated that the predicted savings from the payroll lag would avoid a budget shortfall.

HRS § 78–13 (Supp.1996) (bold emphasis in original) (underscored emphasis added).

Thereafter, the State announced its plan to implement the payroll lag plan, in accordance with Act 80, commencing on January 1, 1997. However, the UHPA demanded that the State negotiate any changes to its traditional fifteenth and last day of the month pay scheme. The State declined, citing Act 80 and stating its intention to implement a lag with or without agreement from the UHPA.

On October 4, 1996, the UHPA filed a prohibited practice complaint with the Hawai'i Labor Relations Board (HLRB), claiming that the implementation of the change in pay scheme altered the terms and conditions of employment and that the anticipated change was subject to negotiation under Hawaii's collective bargaining laws.[8] *See Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 16 F.Supp.2d 1242, 1243 (D.Haw.1998). The HLRB agreed with the UHPA's position and issued an order on January 17, 1997 for the Defendants to cease and desist from implementing the Act 80 amendment without negotiating with the UHPA. Specifically, the HLRB's order found that Act 80 had not amended HRS chapter 89, entitled "Collective Bargaining in Public Employment," and that matters of pay periods and pay dates were clearly bargaining topics:

> [Because] it is difficult to ascertain whether the Legislature intended the pay lag to be negotiable or nonnegotiable, ... the [HLRB] relies upon the unambiguous language of the statute which does not make reference to or supersede Chapter 89, HRS. When the statutes are read together then, the [HLRB] concludes that [the] Defendants may implement a pay lag but must comply with bargaining obligations imposed by Chapter 89, HRS.

Moreover, the HLRB concluded that

> payroll dates concern wages which are conditions of work and are mandatory subjects of bargaining because they have a significant effect on the employee's working conditions.... The [HLRB] notes that the semimonthly pay dates for public officers and employees have remained con-

stant for decades. The [pay lag] will result in the delay in the payment of wages for affected public employees who will receive one less paycheck in the calendar year in which the lag is implemented. The [HLRB] finds that employees who are on a strict budget or who have timely bills to pay will find a delay in pay dates to be a hardship. The [HLRB] thus concludes that a delay in the receipt of wages resulting from the paylag, whether it consists of fourteen or five days, had a significant and material impact on the employees' working conditions in creating a financial hardship for the employees. The lag will affect the compensation for the individual employees and the magnitude of the impact requires negotiations prior to the implementation of the payroll adjustment.

On January 27, 1997, the UHPA and the UH Board of Regents executed a four-year collective bargaining agreement, effective July 1, 1995 to June 30, 1999. Although the collective bargaining agreement included terms regarding salary levels on a monthly and annual basis, there was no mention of any payroll delay.

B. *The Second Amendment to HRS § 78–13 (Act 355)*

On July 3, 1997, the legislature again amended HRS § 78–13. *See* 1997 Haw. Sess. L. Act 355, § 1 at 1117. Act 355 was scheduled to take effect on June 29, 1998. 1997 Haw. Sess. L. Act 355, § 3 at 1118. Section 1 of Act 355 amended HRS § 78–13 by adding the following underscored language, which is at issue in this appeal:

> **Salary Periods.** (a) Unless otherwise provided by law, all officers and employees shall be paid at least semimonthly except that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month and that the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll, may allow a one-time once a month payroll payment to all public offi-

---

8. The Hawai'i State Teachers Association also participated in the HLRB action.

cers and employees to effect a conversion to after-the-fact payroll as follows:

(1) The implementation of the after-the-fact payroll will commence with the June 30, 1998, pay day, which will be delayed to July 1, 1998;

(2) The July 15, 1998, pay day will be delayed to July 17, 1998;

(3) The July 31, 1998, pay day will be delayed to August 3, 1998;

(4) The August 14, 1998, pay day will be delayed to August 19, 1998;

(5) The August 31, 1998, pay day will be delayed to September 4, 1998;

(6) The September 15, 1998, pay day will be delayed to September 18, 1998; and

(7) Thereafter, pay days will be on the fifth and the twentieth of every month. If the fifth and the twentieth fall on a state holiday, Saturday, or Sunday, the pay day will be the immediately preceding weekday.

The implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89.

HRS § 78–13 (Supp.2005) (bold emphasis in original) (underscored emphasis added).[9] Accordingly, pursuant to the Act 355 amendment, the June 30, 1998 pay day would be delayed by *one day* to July 1, 1998, resulting in (1) one regular paycheck, instead of the usual two, being issued in June 1998 and (2)

a total of twenty-three paychecks, instead of the usual twenty-four, in fiscal year 1998. The one-day delay would provide a one-time savings of approximately $51 million in fiscal year 1998—$6.2 million of which would result from the delay of the UH faculty members' pay—because the wages and salaries would be paid from appropriations for the fiscal year 1999, which began on July 1, 1998.

C. *Post–Act 355 Procedural History*

In January 1998, the State announced that it would implement the after-the-fact payroll system according to the time schedule set forth in Act 355. On February 23, 1998, the Plaintiffs filed suit against the Defendants for injunctive and declaratory relief in the U.S. district court. The Plaintiffs sought a declaration that Act 355 unconstitutionally impaired the UHPA's collective bargaining agreement under Article I, Section 10 of the United States Constitution, *see supra* note 4. The Plaintiffs also moved to enjoin the State from converting to the after-the-fact payroll according to Act 355's time schedule.

On June 16, 1999, the U.S. district court granted the Plaintiffs' motion for preliminary injunction against the Defendants, finding that:

[M]any of the [3,175 UHPA] members may experience harm from a pay lag including incurring late fees for bills and credit cards and delays in mortgage payments.

---

**9.** Although not pertinent to the instant appeal, HRS § 78–13 was further amended in June 1998 via Acts 109 and 110, which added four new subsections:

(b) If an employee has been working for the State for at least six months, has no paid leave accumulated, and has an existing salary overpayment balance:
(1) The employee may be paid the employee's salary on the same pay dates and for the same pay periods as non-salaried employees.
(2) Upon accumulation of eighty hours of paid leave, the employee shall be paid the employee's salary on the same pay dates and for the same pay periods as salaried employees.
(c) If an employee has been working for the State for at least six months and has had at least two incidents of leave which results in salary overpayment within the past six months:
(1) The employee may be paid the employee's salary on the same pay dates and for the same pay period as non-salaried employees.
(2) If there are no incidents of leave which result in salary overpayment for a subsequent four-month period, the employee shall be paid the employee's salary on the same pay dates and for the same pay periods as salaried employees.
(d) The implementation of subsections (b) and (c) shall not be subject to negotiation under chapter 89.
(e) All employees, except those belonging to bargaining units 5 and 7, hired on or after July 1, 1998, shall be paid on the same pay dates and for the same pay periods as non-salaried employees.
1998 Haw. Sess. L. Act 109, § 1 at 215–16; 1998 Haw. Sess. L. Act 110, § 1 at 217–18 (as codified at HRS § 78–13 (Supp.2005)). The amendments became effective on June 29, 1998. 1998 Haw. Sess. L. Act 109, § 3 at 216; 1998 Haw. Sess. L. Act 110, § 5 at 218.

In some cases, a delay of even five days could [a]ffect a person's credit report. It is highly unlikely that any damages remedy would adequately compensate the injury of each and every member of UHPA.

*Univ. of Hawai'i Prof'l Assembly*, 16 F.Supp.2d at 1247. The U.S. district court concluded that:

[A] preliminary injunction is proper. [The] Plaintiffs have shown a likelihood of success on the merits because Act 355 substantially impairs the collective bargaining agreement. In addition, [the] Defendants have not shown that such an impairment is reasonable and necessary. Absent a preliminary injunction, irreparable harm is possible, and the balance of hardships weighs against [the] Defendants.

*Id.* at 1248. On appeal to the Ninth Circuit, the preliminary injunction was affirmed on July 14, 1999. *Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999). Specifically, the Ninth Circuit agreed with the U.S. district court that:

[T]he pay dates were material to the terms of employment and, at the time the collective bargaining agreement was negotiated, the timing of the payroll was a negotiable matter....

... The custom and practice of the State had been to pay its employees on the fifteenth and last days of each month. That was the status quo at the time the collective bargaining agreement was entered into.

*Id.* at 1102. Moreover, the Ninth Circuit held that:

[The] Plaintiffs are wage earners, not volunteers. They have bills, child support obligations, mortgage payments, insurance premiums, and other responsibilities. [The] Plaintiffs have the right to rely on the timely receipt of their paychecks. Even a brief delay in getting paid can cause financial embarrassment and displacement of varying degrees of magnitude.

*Id.* at 1106. In light of the preliminary injunction, the State did not change the pay dates for UH faculty members, resulting in an approximately $6.2 million shortfall of the anticipated $51 million in savings for the 1997–98 fiscal year.

Thereafter, the Defendants withheld $6.2 million from UH's budget.[10] As a result, UH was forced to delay payment on some expenses until the next fiscal year.[11] There-

---

**10.** On April 4, 2000, both parties executed and filed "Fact Stipulations," wherein they stipulated to the following relevant facts:

 3. The UH savings in [fiscal year] 1998 from imposition of a payroll lag would have been about $6.163 million ("6.2. million").

 4. The Executive Branch of the State intended, however, that the payroll lag savings would not ultimately benefit the UH, but would be recaptured by the State.

 5. The Executive Branch of the State matched the expected reduction in UH expenditures by a reduction in the budgetary allotment to the UH of the same amount. In other words, the amount of money released to the UH would be restricted by the amount of the expected payroll lag savings. The State thus retained the expected savings in its general fund.

 6. The State's restriction was imposed on the allotment for the fourth quarter of [fiscal year] 1998.

 7. This restriction in allotment was announced on or about September 18, 1997 on a paper conveyed to the UH.

 8. After the fourth quarter, [fiscal year] 1998, allotment was reduced by the amount of the projected payroll lag savings, the UH could not remain within its reduced budgetary al-

lotment unless the lag were imposed or it reduced its expenditure.

 9. The imposition of the payroll lag as to UH faculty was preliminarily enjoined on constitutional grounds by the [U.S. district court.]

 10. On June 25, 1998, following the issuance of the preliminary injunction, [UH President] wrote to Governor Cayetano, requesting the release to the UH of the money that had previously been restricted.

 ....

 16. On July 14, 1998, Governor Cayetano informed [UH President] in writing that he had decided not to restore the money that had been restricted in anticipation of the payroll lag.

**11.** Although not relevant to this appeal, the UHPA, several UH faculty members, and state legislators brought a separate action against the Defendants, challenging their decision to reduce UH's allotment of funds appropriated for a specific fiscal year. *See Mottl v. Miyahira*, 95 Hawai'i 381, 23 P.3d 716 (2001). In *Mottl*, this court concluded that the plaintiffs failed to establish an injury in fact and, thus, did not have standing to bring the action. This court reasoned, *inter alia*, that:

 [T]he plaintiffs' allegation that the withholding of six million dollars from [UH's] appropria-

fore, as noted by the Plaintiffs, "UH then had to confront in [fiscal year 19]99 the problem of [fiscal year 19]98 bills burdening the [fiscal year 19]99 budget, which could only be solved by the same method: pushing $6.2 million in [fiscal year 19]99 bills downstream to [fiscal year 20]00, in the manner of a game of musical chairs, and so on, indefinitely."

After the collective bargaining agreement between the Plaintiffs and the Defendants expired on June 30, 1999, the Defendants moved to dismiss the U.S. district court case as moot and/or to dissolve the order for preliminary injunction. *Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 125 F.Supp.2d 1237, 1240 (D.Haw.2000). The Defendants argued that

> the basis for the preliminary injunction was the effect of Act 355 upon the [collective bargaining agreement] in effect from 1995 until June 30, 1999.... [B]ecause [the agreement] has expired, there is no longer any contract that can be impaired by Act 355.

*Id.* The U.S. district court agreed with the Defendants, holding that, "[i]nsofar as the [collective bargaining agreement] includes a term that [the] Plaintiffs are to be paid on the fifteenth and the thirtieth of each month, this term (and all the other terms) of the [agreement] expired on June 30, 1999." *Id.* at 1241. The court, therefore, dissolved the injunction and dismissed the case by order filed on July 18, 2000, *id.* at 1242, which the Plaintiffs did not appeal.

During the pendency of the proceedings in the federal courts, the Plaintiffs filed a complaint against the Defendants in the circuit court on June 2, 1999. Therein, the Plaintiffs sought a declaratory judgment that the Defendants: (1) failed to publicly announce their intention to implement a payroll lag, a violation of the "reasonable notice" require-

ment of HRS § 78–13 (Supp.2005) [12] (Count I—Failure of Notice); (2) are without authority to impose any payroll lag except in conformity with the specific timetable set forth in HRS § 78–13 (Count II—Breach of Timetable); and (3) may not implement a payroll lag because the one-time-once-a-month payroll provision would violate the semimonthly payroll payment requirement of HRS § 78–13 (Count III—Breach of Semimonthly Pay Requirement).

After the federal court dissolved the injunction and dismissed the federal action in July 2000, the Defendants notified the Plaintiffs, via letter dated August 3, 2000, that the payroll lag would be implemented by delaying the November 15, 2000 pay date to November 20, 2000 and, thereafter, the faculty would be paid each month on the fifth and the twentieth. The resulting effect would be that the UH faculty members would be paid only once in November 2000.

On September 6, 2000, the Plaintiffs amended their complaint, asserting an additional claim that the implementation of the payroll lag is contrary to the public employees' right to organize for the purpose of collective bargaining, in violation of article XIII, section 2 of the Hawai'i Constitution, quoted *infra* (Count IV). On September 11, 2000, the Plaintiffs sought to enjoin the Defendants from implementing the one-time-once-a-month payroll provision, pursuant to HRS § 78–13, in the circuit court. Specifically, the Plaintiffs argued that the implementation of the after-the-fact payroll system would violate: (1) the statutory time schedule set forth in HRS § 78–13; (2) the semimonthly payment requirement of HRS § 78–13; and (3) the faculty's constitutional right to organize for collective bargaining purposes. The Plaintiffs also argued that, because the Defendants had previously provided a full six-months notice of their intention to implement the payroll lag in June 1998 by

tion resulted in "a loss of support for working conditions, teaching programs, research programs, discretionary support staff, replacement of consumable items, and ... electricity and telephone charges" merely invites this court to infer that the plaintiffs, at least some of them, were actually affected.... However, in the absence of evidence in the record establishing what "specific" and "personal" interest

has been affected, the plaintiffs' argument amounts to speculation.
*Id.* at 394–95, 23 P.3d at 729–30 (first ellipsis in original).

**12.** Hereinafter, any reference to HRS § 78–13 pertains to the Act 355 amendment unless otherwise specified.

announcing its intention in January 1998, a similar notice should be given to them prior to the implementation "in order for the faculty to order their financial affairs." On October 20, 2000, the circuit court granted the Plaintiffs' motion for preliminary injunction, finding that:

[1.] There is a substantial likelihood that [the] Plaintiffs will prevail on the merits. The Defendants have failed to provide reasonable notice to the Plaintiffs as required by HRS § 78–13(a) (1993), as amended[; and]

[2.] [The] Plaintiffs will be irreparably harmed if the Defendants fail to tender the Unit 7 [UHPA members] paychecks on November 15, 2000, since they will only be paid half-a-month's wages for a full month's work. A delay in payroll to 3,100 individual Unit 7 faculty may have a very real effect on their ability to meet their financial obligations in a timely manner. A damages remedy is not likely to redress each employee's injury.

On March 9, 2001, the circuit court issued a notice of proposed dismissal inasmuch as no trial setting status conference had been scheduled as required by Rules of the Circuit Court of the State of Hawai'i (RCCH) Rule 12(c) (2004).[13] On March 20, 2001, the Plaintiffs filed their objection to the proposed dismissal, essentially arguing that they were attempting to resolve the payroll lag matter through the bargaining of a successor contract to the 1995–1999 agreement, which was still pending. The Plaintiffs maintained that:

Both sides are content to leave the status quo alone, pending the possible resolution of the underlying issues through collective bargaining. If collective bargaining fails to resolve the issues, then it makes sense to have a status conference to evaluate other options.

The Defendants, however, supported the dismissal, asserting that the Plaintiffs intended to keep the case alive to enhance their bargaining position during negotiations over a collective bargaining agreement. Subsequently, the circuit court issued an order withdrawing the notice of proposed dismissal.

On March 30, 2001, the Defendants filed a motion to dismiss, arguing that, because the anticipated date of implementation of the payroll lag had passed, the case was moot. The circuit court denied the motion. On May 17, 2001, the Defendants filed a motion for judgment on the pleadings, arguing that the complaint had no merit as a matter of law. The Plaintiffs filed an opposition, citing to matters outside the pleadings. The motion was heard on July 10, 2001, at which time the circuit court indicated an inclination to deny Defendants' motion based upon the Plaintiffs' opposition; however, inasmuch as the opposition referred to matters outside of the pleadings, the circuit court concluded that it would treat the motion as one for summary judgment.[14] The circuit court then reset the matter for hearing on August 21, 2001 and allowed the parties to brief the matter of summary judgment.

On August 3, 2001, the Defendants filed their motion for summary judgment, arguing that the implementation of an after-the-fact payroll for faculty members does not violate HRS § 78–13. The Defendants maintained, *inter alia*, that the time schedule set forth in

---

**13.** RCCH Rule 12(c)(1) provides that:

Except in cases which have been designated as complex litigation, within 60 days of the filing of the initial pretrial statement, the plaintiff in all cases filed in the First Circuit shall schedule a trial setting status conference that shall be attended by each party or each party's lead counsel[.]

The Plaintiffs filed their pretrial statement on March 31, 1999. Moreover, RCCH Rule 12(q) (2004) provides in pertinent part that,

if a trial setting status conference has not been scheduled as required by Rule 12(c), the clerk shall notify in writing all parties affected thereby that the case will be dismissed for want of prosecution unless objections thereto showing good cause (specific reasons) are filed within 10 days after receipt of such notice.

**14.** HRCP Rule 12(c) (2004) provides:

**Motion for judgment on the pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

the Act 355 amendment is directory and not mandatory. Relying on *Perry v. Planning Commission of the County of Hawai'i*, 62 Haw. 666, 619 P.2d 95 (1980), the Defendants argued that:

> (1) there is nothing in Act 355 that negates the Governor's authority to apply the payroll lag after the scheduled implementation; (2) time is clearly not of the essence, as the implementation schedule was merely to make the after-the-fact payroll less burdensome to State employees; and (3) no public interests or private rights are jeopardized by the delayed implementation as to faculty members.

They further maintained that the application of an after-the-fact payroll system would not violate the faculty's constitutional right to organize for collective bargaining purposes inasmuch as,

> traditionally[,] pay days for public employees were determined by statute, not by collective bargaining. *See* HRS § 78–13 (1993). Consequently, a statute that changes pay days does not violate any specific term of the expired collective bargaining agreement, and since the parties have not negotiated pay days, the fact that the pay days are changed by statute does not interfere with whatever constitutional right the faculty has to organize for the purpose of collective bargaining.

On August 14, 2001, the Plaintiffs filed their cross-motion for summary judgment, reiterating that the implementation of the payroll lag would violate HRS § 78–13. The Plaintiffs specifically argued that:

> The new and improved Act 355 (1997) . . . provided that if the Governor chose to proceed with the lag, a *specific schedule* for implementation would be mandatory. Act 355 did not make the lag mandatory, but if the Governor chose to implement, it restricted implementation to the period June through September, 1998.

(Emphasis in original.) The Plaintiffs also argued that the implementation of the payroll lag would be an unconstitutional restriction on public sector bargaining of wages, noting that, under the plan, employees would face an actual four percent loss of income in a year, and fifty percent lost of income in a month, and:

> Faculty, like most everyone else, and presumably like the State itself, pay bills, like home rental, car loans, and tuition, on a monthly cycle. Bills come due regularly. Some, like child support payments, are due on a certain day and are enforced by law. If payments are not made within the monthly cycle, they are late. Whether a day late or a week late, a late payment has consequences, and it's illegal to write a check for which funds are not on deposit.

On September 10, 2001, the circuit court conducted a hearing on the parties' motions and, thereafter, issued its written orders (1) denying the Defendants' "motion for judgment on the pleadings" [15] and (2) granting the Plaintiffs' cross-motion for summary judgment. In both orders, the circuit court found, *inter alia*, that:

> [1.] Imposition of a payroll lag on [UH] faculty, by means of a one-time, once a month paycheck, would deprive [the] faculty [members] of one paycheck in the month and year of implementation, or 50% of their salary in the month of implementation and 1/24 of their salary in the year of implementation.

> [2.] This loss of income would have a material and significant effect on the faculty, especially the lower-paid faculty. Such a pay loss would be of a magnitude comparable to other issues that triggered the UHPA strike of 2001. A payroll lag would likely impose a substantial hardship on employees, who might not be able to meet their financial obligations, such as mortgage payments or court-ordered child support payments, in a timely manner. Employee contributions to benefit funds that depend on receipt of a paycheck could be delayed, in some cases requiring the employees to dip into savings—if any—to maintain timely payments. Faculty may

---

15. As previously stated, the circuit court indicated that it would treat the Defendant's motion for judgment on the pleadings as one for summary judgment. Nevertheless, the Defendants filed a separate and specific motion for summary judgment; however, the written order entered by the court was titled, "Order Denying Defendants' Motion for Judgment on the Pleadings."

also incur late fees and other penalties due to the pay lag. A damage remedy would likely not address each employee's injury, as previously recognized by this [c]ourt and the U.S. [d]istrict [c]ourt[.]

[3.] The public interest favors the Plaintiffs. [The] Defendants have not shown that the payroll lag is both reasonable and necessary to fulfill an important public purpose.

Accordingly, the circuit court concluded that:

1. Section 78–13, HRS, requires twice-monthly pay for all [UH] faculty, subject only to one possible exception.

2. The exception from the twice-monthly requirement, found in § 78–13(a), HRS, pertains to a payroll lag imposed in 1998, and is not available to Defendants.

3. Defendants' imposition of a payroll lag on Plaintiff faculty would violate § 78–13(a), and would therefore be illegal.

Moreover, with respect to the order granting the Plaintiffs' motion for summary judgment, the circuit court added that "[a]n injunction against illegal imposition of a lag is justified, and is consistent with Plaintiff's prayer for relief." The circuit court, thus, entered a permanent injunction against the Defendants from implementing the Act 355 payroll lag plan upon the UH faculty members. Final judgment was entered on December 12, 2001.

On December 27, 2001, the Defendants appealed the December 12, 2001 judgment. This court, however, dismissed the appeal on April 30, 2002 for lack of appellate jurisdiction because the final judgment "d[id] not identify the claims for which it [was] entered or that judgment [was] entered on all ... of the [Plaintiffs'] causes of action." A first amended judgment was then entered on June 7, 2002. Therein, the circuit court: (1) entered judgment in favor of the Plaintiffs with respect to the Defendants' violation of HRS § 78–13's breach of semimonthly payment requirement (Count III); (2) dismissed all other claims of the Plaintiffs; and (3) permanently restrained and enjoined the Defendants from imposing the after-the-fact payroll system upon UH faculty members. On June 24, 2002, the Defendants timely filed their notice of appeal in the instant case.

## II. STANDARDS OF REVIEW

### A. Motion for Summary Judgment

The standard of review regarding a grant of summary judgment is well established:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citations omitted) (brackets in original). "[This court] review[s] an award of summary judgment under the same standard applied by the circuit court." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992). This court, therefore, reviews the record *de novo*. *Yamagata v. State Farm Mut. Auto. Ins. Co.*, 107 Hawai'i 227, 229, 112 P.3d 713, 715 (2005).

### B. Statutory Interpretation

"The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*." *Liberty Mut. Fire Ins. Co. v. Dennison*, 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (quoting *Labrador v. Liberty Mut. Group*, 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003)) (internal quotation marks omitted). In so doing, this court must adhere to the well-established rule of statutory construction that the "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Gray v. Admin. Dir. of Court*, 84 Hawai'i

138, 148, 931 P.2d 580, 590 (1997) (citations omitted).

## C. *Constitutional Construction*

▮▮▮▮ [This court] review[s] questions of constitutional law *de novo*, under the right/wrong standard. [This court] answer[s] questions of constitutional law by exercising [its] own independent judgment based on the facts of the case.

In interpreting a constitutional provision, the words of the constitution are presumed to be used in their natural sense ... unless the context furnishes some ground to control, qualify or enlarge them.

[This court] ha[s] long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent. This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument.

*United Pub. Workers, AFSCME, Local 646 v. Yogi,* 101 Hawai'i 46, 49–50, 62 P.3d 189, 192–93 (2002) (citations, internal quotation marks, and parentheses omitted) (ellipsis in original).

## III. *DISCUSSION*

On appeal, the Defendants contend that the circuit court erred in concluding that the implementation of the payroll lag would violate the twice-monthly payment requirement of HRS § 78–13(a) and in failing to rule upon the constitutional issue raised by the Plaintiffs. Although the Defendants also contend that the circuit court erred in failing to rule upon the issue relating to the statutory time schedule, the circuit court's order specifically states that HRS § 78–13(a) "requires twice-monthly pay for all University faculty, *subject only to one possible exception* [,]" that is, a payroll lag to be imposed *in 1998.* (Emphasis added.) In other words, the circuit court concluded that the application of a payroll lag at any time other than the time specified in the statute, *i.e.,* 1998, would violate the semimonthly payment requirement.

▮▮▮▮ Accordingly, the issues before this court are: (1) whether the Act 355 amendment to HRS § 78–13(a) violates article XIII, section 2 of the Hawai'i Constitution, which provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law[,]" such that a permanent injunction was warranted; and, if not, (2) whether the circuit court properly concluded that the implementation of HRS § 78–13— after the specific dates set forth in the subject statute had passed—would violate the twice-monthly payment requirement of section 78–13(a) such that an injunction remained proper.[16]

16. We note here that the concurring and dissenting opinion agrees with the result reached by the majority, but disagrees with its analysis [hereinafter, the dissent or dissenting opinion]. Relying upon the rulings made by the HLRB and the U.S. district court, including the subsequent affirmance by the Ninth Circuit, the dissent, instead, believes that the Defendants "are collaterally estopped," dissenting op. at 193, 140 P.3d at 426, from asserting that the Plaintiffs mistakenly equate pay dates with wages. *Id.* In sum, the dissent maintains that "the issue of whether pay dates are a core subject of collective bargaining has already been decided upon, not only once, before the HLRB ... but also by the district court and on appeal of that decision." Dissenting op. at 196, 140 P.3d at 429.

In *Dorrance v. Lee,* 90 Hawai'i 143, 976 P.2d 904 (1999), this court held that:

[T]he doctrine of collateral estoppel bars litigation of an issue where: (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication[.]

*Id.* at 149, 976 P.2d at 910. Applying the aforementioned test to the facts of this case, we conclude that the collateral estoppel doctrine is inapplicable. First, the HLRB's decision was based upon the Act 80 amendment, which the dissent concedes was "overturned" by the legislative enactment of Act 355, dissenting op. at 195, 140 P.3d at 428. Moreover, as previously stated, the HLRB specifically relied upon the fact that "the unambiguous language of the statute ... does not make reference to or supersede Chapter 89, HRS." Act 355, promulgated after the issuance of the HLRB's decision, specifically states, "The implementation of the after-the-fact

### A. The Constitutionality of HRS § 78-13(a), as Amended

Specifically, the Plaintiffs maintain that the implementation of HRS § 78-13 would deprive them of the right to bargain over core matters under article XIII, section 2 of the Hawai'i Constitution because: (1) although HRS § 78-13 required twice-monthly pay days, it did not specify the dates inasmuch as pay dates were within the scope of collective bargaining; and (2) the modification of HRS § 78-13 to include a payroll lag created a legislatively-mandated cut in wages, stemming from the one-time-once-a-month pay provision, and the subsequent delay in pay days. Conversely, the Defendants argue that: (1) the change in pay dates does not interfere with whatever constitutional right the faculty has to organize for the purpose of collective bargaining; and (2) the constitutional right of public employees to organize for the purpose of collective bargaining is not absolute under article XIII, section 2 of the Hawai'i Constitution, thereby permitting the legislature to retain the ultimate authority to govern the parameters of collective bargaining, which includes when public employees are to be paid.

In sum, the parties' constitutional arguments focus upon two main inquiries: (1) whether pay dates are within the scope of collective bargaining; and (2) whether the

payroll shall not be subject to negotiation under chapter 89." HRS § 78-13 (Supp.2005).

Second, the Plaintiffs sought a preliminary injunction from the U.S. district court, which it granted and the Ninth Circuit affirmed, based upon their allegations that Act 355 violated the Contract Clause of the United States Constitution—and not article XIII, section 2 of the Hawai'i Constitution relating to collective bargaining.

Third, the U.S. district court's grant of a preliminary injunction is "not a final judgment sufficient for collateral estoppel purposes." Starbuck v. City & County of San Francisco, 556 F.2d 450, 457 n. 13 (9th Cir.1977); Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1350–51 (9th Cir. 1982) ("issues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel"); Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 537 (2005) ("A preliminary injunction is a provisional remedy, and the trial court possesses the inherent power to modify its preliminary injunction which is of a continuing or executory nature." (Emphasis, citations, and internal quotation marks omitted.)).

Finally, as the dissent points out, the grant or denial of a preliminary injunction "will be given preclusive effect if it is necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits"—i.e., "the decision need only be immune, as a practical matter, to reversal or amendment." Miller Brewing Co. v. Jos. Schlitz Brewing Co., 605 F.2d 990, 995–96 (7th Cir.1979); Bomberger v. McKelvey, 35 Cal.2d 607, 612, 220 P.2d 729 (Cal.1950) ("[U]nless it appears that the court intended a final adjudication of the issue involved, a decision on an application for a preliminary injunction does not amount to a decision on the ultimate rights in controversy." (Citation omitted.)). Thus, "findings made in granting or denying preliminary injunctions can have preclusive effect if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again." Hawksbill Sea Turtle v. FEMA, 126 F.3d 461, 474 n. 11 (3d Cir.1997); see also Commodity Futures Trading Comm'n v. Bd. of Trade, 701 F.2d 653, 657 (7th Cir.1983) (findings made in preliminary injunction decisions have preclusive effect "if the circumstances make it likely that the findings are accurate [and] reliable,"—depending on the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review). However, the federal preliminary injunction and the Ninth Circuit's subsequent affirmance are clearly not "sufficiently firm" to merit preclusive effect inasmuch as the U.S. district court ultimately dismissed the preliminary injunction—not on the merits—but as moot in light of changed circumstances, i.e., the expiration of the Plaintiffs' collective bargaining agreement. As the U.S. district court in Ocean Conservancy v. Nat'l Marine Fisheries Serv., 416 F.Supp.2d 972 (D.Haw.2006), also cited by the dissent, states:

> [I]t is possible that a court may decide that a prior ruling need not be vacated because there is no possibility that it will have any collateral consequences. Although this approach is tempting, it should be easier to vacate than to make a responsible determination that there is indeed no risk of future consequences. In contrast, a court may be tempted to conclude that its findings might warrant preclusive effect in later litigation, and refuse to vacate so that later courts can employ preclusion if it seems appropriate....

Id. at 979 (quoting 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice & Procedure Jurisdiction 2d § 3533.10 (Supp.2005)). Here, on July 18, 2000, the U.S. district court dissolved the injunction and dismissed the case, clearly expressing its intention that future litigation should not be collaterally estopped. Inasmuch as the dissent's remaining contentions flow from its conclusion that collateral estoppel applies, we need not address them.

payroll lag interferes with the right to negotiate wages. For ease of discussion, the issues presented by the parties are addressed in the following sequence: (1) the plain meaning of HRS § 78–13(a); (2) the interpretation of article XIII, section 2 of the Hawai'i Constitution in conjunction with the collective bargaining statute, *i.e.*, HRS chapter 89, entitled "Collective Bargaining in Public Employment"; and (3) the effect of the Act 355 amendment upon UH faculty members' constitutional rights.

### 1. HRS § 78–13(a)

As previously indicated, prior to the Act 80 and Act 355 amendments, HRS § 78–13 (1993) provided:

> **Salary Periods.** (a) <u>Unless otherwise provided by law</u>, all officers and employees shall be paid at least semimonthly <u>except</u> that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month.

(Bold emphasis in original.) (Underscored emphases added.) By its plain terms, HRS § 78–13 mandated that all public employees were to be paid twice a month. However, a "once a month" payment scheme was permitted under two narrow exceptions: (1) where such payments are "otherwise provided" by law; and (2) for employees who are "substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees." With the passage of Act 80, the legislature carved out a third exception to the twice-monthly payment requirement, commonly referred to as the payroll lag, which provided that

> the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll, may allow a one-time once a month payroll

payment to all public officers and employees to effect a conversion [from predicted payroll] to after-the-fact payroll[.]

1996 Haw. Sess. L. Act 80, § 1 at 103 (emphasis omitted). The payroll lag exception remained intact with the passage of the Act 355 amendment, but incorporated additional language that explicitly provides that

> the governor ... may allow a one-time once a month payroll payment to all public officers and employees to effect a conversion [from predicted payroll] to after-the-fact payroll as follows:
>
> (1) The implementation of the after-the-fact payroll will commence with the June 30, 1998, pay day, which will be delayed to July 1, 1998;
>
> (2) The July 15, 1998, pay day will be delayed to July 17, 1998;
>
> (3) The July 31, 1998, pay day will be delayed to August 3, 1998;
>
> (4) The August 14, 1998, pay day will be delayed to August 19, 1998;
>
> (5) The August 31, 1998, pay day will be delayed to September 4, 1998;
>
> (6) The September 15, 1998, pay day will be delayed to September 18, 1998; and
>
> (7) Thereafter, pay days will be on the fifth and the twentieth of every month. If the fifth and the twentieth fall on a state holiday, Saturday, or Sunday, the pay day will be the immediately preceding weekday.

HRS § 78–13(a) (Supp.2005). The Act 355 amendment also expressly indicates that "[t]he implementation of the after-the-fact payroll shall *not be subject to negotiation under chapter 89.*" HRS § 78–13(a) (emphasis added).

### 2. Article XIII, Section 2 of the Hawai'i Constitution

■ As previously stated, article XIII, section 2 [formerly article XII, section 2 [17]] of

---

17. Prior to 1968, article XII, section 2 provided that "[p]ersons in public employment shall have the right to organize and to present and make known their grievances and proposals to the State, or any political subdivision or any department or agency thereof." *Proceedings of the*

*Constitutional Convention of Hawai'i of 1968*, Vol. 2 at 476 (1972) (internal quotation marks omitted) [hereinafter 1 *Proceedings 1968*]. Article XII, section 2 was amended in 1968 to read "[p]ersons in public employment shall have the right to organize for the purpose of collective

the Hawai'i Constitution provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining *as provided by law*." (Emphasis added.) The Defendants argue that, "[b]ly inserting the words 'as provided by law' into article XIII, section 2, the drafters of the Hawai'i Constitution intended for the legislature to retain the ultimate authority to govern the parameters of collective bargaining." The Plaintiffs, on the other hand, assert that:

> Although Article XIII, Section 2, contains the phrase "as provided by law," this cannot mean that the phrase "organize for the purpose of collective bargaining" has only the meaning ascribed to it by the legislature. To so hold would mean the people had voted for an empty proposition, utterly malleable at the whim of the legislature, with no intrinsic meaning; this would be a most cynical reading indeed.

The precise arguments raised here were examined by this court in *United Pub. Workers, AFSCME, Local 646 v. Yogi*, 101 Hawai'i 46, 62 P.3d 189 (2002), and its analysis and holding controls.

In *Yogi*, four public employee unions sought declaratory and injunctive relief against the State and various State officials and agencies, alleging that section 2 of Act 100 (1999),[18] which prohibited public employees and public employee unions from collectively bargaining over cost items for the 1999–2001 biennium, violated article XIII, section 2 of the Hawai'i Constitution. In support of their contention that section 2 of Act 100 was not unconstitutional, the defendants maintained that, by inserting the phrase "as provided by law," the framers intended "to give complete discretion to the legislature to define the terms of collective bargaining for public employees." *Id.* at 49, 62 P.3d at 192 (internal quotation marks omitted). In other words, the defendants concluded that, "if the legislature had the power to grant public employees the right to collectively bargain over costs items, the legislation had the authority to suspend that right." *Id.* (internal quotation marks omitted).

In analyzing the import of the phrase "as provided by law," this court first observed that:

> Similar principles of construction were applied to the identical phrase in article I, section 11[ ] in *State v. Rodrigues*, 63 Haw. 412, 629 P.2d 1111 (1981). Section 11 "created the position of an independent grand jury counsel, but it failed to define the number of independent counsel required, appointment or removal procedure, qualifications, length of term, compensation, or source of funding." *Id.* at 414, 629 P.2d at 1113.... [T]his court observed that, at the time article I, section 11 was adopted,

bargaining as prescribed by law." *Id.* at 479 (internal quotation marks omitted). Ten years later, at the 1978 Constitutional Convention, article XII, section 2 was renumbered as article XIII, section 2, and the phrase "as prescribed by law" was replaced with the phrase "as provided by law." *Proceedings of the Constitutional Convention of Hawai'i of 1978*, Vol. 1 at 743 (1980) [hereinafter, 1 *Proceedings 1978* ].

**18.** Section 2 amended HRS § 89–9, entitled "Scope of negotiations; consultation," by adding the following underscored language to subsection (a):

> (a) The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budget-making process, and shall negotiate in good faith with respect to wages, hours, the number of incremental and longevity steps and movement between steps within the salary range, the amounts of contributions by the State and respective counties to the Hawai'i public employees health fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement, or any question arising thereunder, but such obligation does not compel either party to agree to a proposal or make a concession; provided that the parties may not negotiate with respect to cost items as defined by section 89–2 for the biennium 1999 and 2001, and the cost items of employees in bargaining units under section 89–6 in effect on June 30, 1999, shall remain in effect until July 1, 2001.

1999 Haw. Sess. L. Act 100, § 2 at 368–69 (as codified at HRS § 89–9 (Supp.2001)) (emphasis added). "Cost items" are defined as "all items agreed to in the course of collective bargaining that an employer cannot absorb under its customary operating budgetary procedures and that require additional appropriations." HRS § 89–2 (Supp.2001). Wages and cost items are among the core subjects of collective bargaining. *See* HRS § 89–3 (Supp.2001).

*there was no other constitutional provision or statute to which the phrase "as provided by law" could refer. Id.* at 415, 629 P.2d at 1114. *We held that[,] in the absence of a constitutional provision or statute to which "as provided by law" could refer, "subsequent legislation was required to implement the amendment." Id.,* 629 P.2d at 1114.

*Yogi,* 101 Hawai'i at 50, 62 P.3d at 193 (brackets and footnote omitted) (emphases added). However, the *Yogi* court concluded that *Rodrigues* was factually distinguishable, stating that, "[u]nlike the amendment at issue in *Rodrigues,* when article XII, section 2 was amended in 1968, there were pre-existing federal and state statutes, constitutional provisions, and court cases which g[a]ve meaning to the term 'collective bargaining.' " *Id.* at 51, 62 P.3d at 194. As this court pointed out:

> Before the framers convened in 1950, the Wagner Act, as amended, defined collective bargaining as the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d) (2002). In 1945, territorial lawmakers modeled Hawaii's first collective bargaining statute after [the] Wagner Act, and specifically defined collective bargaining in the Hawai'i Employment Relations Act as follows:
>
> > "Collective bargaining" is the negotiating by an employer and a majority of the employer's employees in a collective bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.
> >
> > HRS § 377-1(5).
>
> . . . .
>
> [Moreover,] [t]he record of the proceedings at the 1968 constitutional convention verified that the framers actually knew wh[at] "collective bargaining as provided by law" (or as "prescribed by law") meant. 1 *Proceedings 1968* at 207, 342, 429. In

fact, they were even provided a written opinion by the Attorney General on the legal question.

> "Collective bargaining" has been defined as: "[A] procedure looking toward the making of a collective agreement between the employer and the accredited representative of his employees concerning wages, hours, and other conditions of employment." 51 CJS, *Labor Relations* (1967 ed.), sec. 148.
>
> 1 *Proceedings 1968* at 479.

*Id.* Accordingly, the *Yogi* court concluded that "we must consider the constitutionality of Section 2 of Act 100 in light of these other sources of law which give meaning to [article XIII, section 2 of the Hawai'i Constitution]." *Id.* at 51–52, 62 P.3d at 194–95. Based on its examination of the 1968 constitutional convention proceedings, this court concluded that "the framers of article XII, section 2 did not intend to grant our legislators complete and absolute discretion to determine the scope of 'collective bargaining.' " *Id.* at 52, 62 P.3d at 195.

For instance, the framers defeated an amendment in the committee of the whole to limit public employee rights to "procedures as established by law in the areas therein prescribed" by a vote of 62 to 13. 1 *Proceedings 1968* at 495. Moreover, when Delegate [Charles E.] Kauhane voiced his understanding of the purpose of Committee Proposal No. 5 (thereafter adopted as article XII, section 2), it was evident that no one opposed such interpretation. Delegate Kauhane remarked:

> Mr. Chairman, I speak in favor of Proposal No. 5. The purpose and intent of Proposal No. 5 is to protect the right to organize for the purpose of collective bargaining. **As a matter of Constitutional right, however, that right is subject to reasonable regulation by the legislature. That's why the insertion of the words "as prescribed by law" or probably some would like to have the words "in accordance with law." Certainly, Mr. Chairman, the legislators should be prevailed upon to take their stand on this matter of providing the necessary regulations as**

prescribed by law. **This is one of the responsibilities and they should not shirk this responsibility in providing the necessary regulations for collective bargaining by government employees.**

1 *Proceedings 1968* at 497–98. Delegate Kauhane observed:

> Perhaps the words "as prescribed by law" mean that the right of collective bargaining and the right to organize don't exist until the legislature prescribes and recognizes that right. And therefore the legislature should at this time recognize this right and establish regulations for the right for collective bargaining. To recognize the right to organize for the purpose of collective bargaining is a matter of policy. *It does not mean that the legislature can take away that right nor remove that right, of the public employees to organize and bargain collectively.* This proposal is for the purpose, the full purpose of protecting the rights of public employees to organize for the specific purpose of collective bargaining. I urge that the proposal submitted by the committee be approved.

1 *Proceedings 1968* at 498 (emphasis added). Thereafter, Committee Proposal No. 5 was adopted by a vote of 57 to 17. The fact th[at] none of the framers rose to oppose such interpretation was a strong indicia of the framers' acquiescence to Delegate Kauhane's understanding of the phrase "as prescribed by law."

*Id.* at 52, 62 P.3d at 195 (bold emphasis added). This court also concluded that, clearly,

> when the people ratified article XII, section 2, *they understood the phrase to entail the ability to engage in negotiations concerning core subjects such as wages, hours, and other conditions of employment.* Section 2 of Act 100 violates article XII, section 2, because it withdraws from

the bargaining process these core subjects of bargaining that the voters contemplated.

*Id.* at 53, 62 P.3d at 196 (emphasis added).

In light of the foregoing, the Defendants' contention in the instant case that "the drafters of the Constitution intended for the legislature to retain the *ultimate authority* to govern the parameters of collective bargaining," (emphasis added), is contrary to the conclusion reached in *Yogi.* As more aptly stated in the concurring opinion by Justice Nakayama,[19] article XIII, section 2 bestows upon the legislature

> *broad discretion in setting the parameters for collective bargaining.* Indeed, the legislature has constitutionally exercised such discretion on previous occasions. *See* [HRS] § 89–6 (1993) (establishing bargaining units); HRS § 89–9(d) (1993) (specifying matters that are not subject to collective bargaining); HRS § 89–10(c) (1993) (determining the expiration date for collective bargaining agreements and proscribing the reopening of cost items during the term of the agreement).
>
> *While the legislature is given broad discretion pursuant to article XIII, section 2, the language "as provided by law" does not give the legislature **unfettered** discretion to infringe upon the core principles of collective bargaining.*

*Id.* at 55, 62 P.3d at 198 (emphases added). Thus, *Yogi* stands for the proposition that the legislature has broad discretion in setting the parameters for collective bargaining as long as it does not impinge upon the constitutional rights of public employees to organize for the purpose of collective bargaining and to negotiate core subjects of collective bargaining, that is, wages, hours, and other conditions of employment. Accordingly, the remaining question is essentially whether the Act 355 amendment violates such constitutional rights.

**3. The Effect of the Act 355 Amendment**

As stated in *Yogi,* the framers, in formulating and adopting article XII, section 2, ac-

---

**19.** *Yogi* contained two separate concurring opinions—one by Justice Nakayama, in which Chief Justice Moon and Justice Levinson joined, and the other by Justice Acoba.

knowledged that the term "collective bargaining" had a well-recognized meaning:

> "Collective bargaining" means the performance of the mutual obligations of the public employer and the exclusive representative to meet at reasonable times, to confer and *negotiate in good faith, and to execute a written agreement with respect to wages, hours, amounts of contributions by the State and counties to the Hawai'i public employees health fund, and other terms and conditions of employment,* except that by any such obligation neither party shall be compelled to agree to a proposal, or be required to make a concession.

HRS § 89–2 (1993) (emphasis added); *see also Yogi*, 101 Hawai'i at 51, 62 P.3d at 194. Further, pursuant to HRS § 89–3 (1993), entitled "Rights of employees":

> Employees shall have the right of self-organization and the right to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, and other terms and conditions of employment[.]

#### a. *change in pay dates*

 It is undisputed that, historically, public employees, including UH faculty members, were paid on the fifteenth day and the last day of each month. The Act 355 amendment authorized the governor to convert the existing predicted payroll system to an after-the-fact payroll system by gradually delaying each paycheck until the pay dates fell on the fifth and the twentieth of the month. The Defendants note that,

> traditionally[,] pay days for public employees were determined by statute, not by collective bargaining. *See* HRS § 78–13 (1993). Consequently, a statute that changes pay days does not violate any specific term of the collective bargaining agreement, and since the parties have not negotiated pay days, the fact that pay days are changed by statute does not interfere with whatever constitutional right the fac-

ulty has to organize for the purpose of collective bargaining.

The Plaintiffs disagree, contending that:

> Before the payroll lag law, pay days were *not* set by statute. [HRS] § 78–13 historically required twice-monthly pay days, but did not specify them. HLRB's Order ... affirmed that[,] even in the face of Act 80 (1996), pay dates were not set by statute. Only since the advent of the payroll lag and Act 355 (1997) (intended to remove pay dates from the scope of collective bargaining) has the State attempted to specify paydays by statute. Statutory specification of paydays was certainly not a traditional practice as of 1968, when [a]rticle XIII, [s]ection 2, was adopted.

In response, the Defendants reiterate that:

> The number of paychecks state employees receive each month has historically been set by statute, HRS § 78–13, although the specific dates were not specified. That statute, § 78–13, reserved for the Legislature the right to modify any salary periods by law. Significantly, this reservation of the Legislature's right to modify salary periods pre-dates the adoption of the constitutional right to organize for the purpose of collective bargaining. Consequently, where the constitutional right to organize "as provided by law" and the subsequent collective bargaining agreements incorporated existing law by implication, the Legislature's reservation of the right to amend salary periods was necessarily incorporated as well. Therefore, a statute changing the salary periods does not violate ... the Constitutional right to organize for the purpose of collective bargaining.

(Emphasis, citation, and footnote omitted).

 Based on a plain reading of HRS § 78–13 (1993), public employees are to be paid twice a month, which the Plaintiffs concede. However, as the Plaintiffs correctly point out, nowhere in the statute does the legislature direct that the twice-monthly payment must fall on the fifteenth day and the last day of the month. But, at the same time, HRS chapter 89, regarding collective bargaining for public employees, does not expressly indicate that the specific pay days

must be negotiated through collective bargaining. As previously noted, implicit within article XIII, section 2 is the right to collectively bargain over "wages, hours, and other terms and conditions of employment." *See* HRS § 89–2 and HRS § 89–3. Nevertheless, the Plaintiffs have failed to demonstrate that bargaining over pay dates is one of the core subjects of collective bargaining that triggers a violation of article XIII, section 2. The Plaintiffs have also failed to provide this court with their collective bargaining agreement to support their contention that pay dates are bargainable and, in fact, admit that pay dates "[were] not specifically incorporated into the contract."

Accordingly, we reject the Plaintiffs' contention that, because pay dates have never been specified in any statute, the Act 355 amendment to unilaterally alter the "traditional practice" of being paid on the fifteenth day and the last day of the month violates their right to collectively bargain pay periods.

### b. *infringement on the right to collectively bargain over wages*

■ On appeal, the Defendants maintain that the Plaintiffs would suffer no actual diminution of salary because there would be no change in the salary, just a change in the method or timing of the payments. Specifically, the Defendants argue:

> The bottom line is each employee, following a payroll lag, will be paid the same amount of money for the same amount of work. The Legislature has merely changed the dates in which the employee is paid; the work remains the same and the salary remains the same.

Therefore, the Defendants submit that the payroll lag "is not a pay cut[,] ... cannot constitute a change in 'wages,' " and does not violate the employees' constitutional rights to collectively bargain. The Plaintiffs, on the other hand, assert that,

> under the payroll lag plan, more than a single check would be delayed; *all* checks, forever after, would be delayed. This has

quite [a] different and permanent effect. At the end of July, 1998, the employee lagged under Act 355 is one check light. Instead of two checks for June and two for July, he has received only three checks. At the end of August, 1998, instead of two checks for June, two checks for July, and two checks for August, the employee has received only five checks.... No matter what month you pick, at the end of it, the employee is always one check light, compared to the pre-lag arrangement.

(Emphasis in original.) The Plaintiffs, therefore, take the position that "the payroll lag impinges on wages, bargaining of which is a core right," and thereby violates the Hawai'i Constitution, citing *Yogi, supra.* We cannot agree.

As previously indicated, the payroll lag was implemented to convert from a predict payroll system to an after-the-fact payroll system and was deemed to be "the least drastic measure to realize a savings of $47 million because it required no reduction in programs, no further reduction in personnel, and no increase in taxes." The implementation plan called for public employees' paychecks to be gradually delayed over several consecutive months (with each paycheck being delayed for one day to four days) until the pay dates fell on the fifth and twentieth day of the month. In other words, taking the time schedule set forth in HRS § 78–13(a) as an example, the Plaintiffs would have been paid:

On July 1, 1998 (instead of June 30, 1998), for work performed between June 16 and June 30, 1998;

On July 17, 1998 (instead of July 15, 1998), for work performed between July 1 and July 15, 1998;

On August 3, 1998 (instead of July 31, 1998), for work performed between July 16 and July 31, 1998;

On August 19, 1998 (instead of August 14, 1998 [20]), for work performed between August 1 and August 15, 1998;

---

20. Because August 15, 1998 was a Saturday, employees would have, in the absence of the payroll lag, received their paychecks on the immediate preceding weekday, which was August 14, 1998.

On September 4, 1998 (instead of August 31, 1998), for work performed between August 16 and August 31, 1998;

On September 18, 1998 (instead of September 15, 1998), for work performed between September 1 and September 15, 1998;

On *October 5, 1998* (instead of September 30, 1998), for work performed between September 16 and September 30, 1998; and

On *October 20, 1998* (instead of October 15, 1998), for work performed between October 1 and October 15, 1998.

The Plaintiffs view the payroll lag as a "pay cut," arguing that "the employee is always one check light." The Plaintiffs, however, do not—and, indeed, cannot—point to any specific instance where the payroll lag resulted in an employee being paid less for the same amount of work, or being paid the same amount, but required to do more work. Neither has there been a serious suggestion—let alone any proof—that two-week's pay has been permanently withheld; it has only been delayed. Thus, it can hardly be said that the payroll delay evades one of the core subjects of collective bargaining, *i.e.,* wages.[21]

Indeed, aside from the Plaintiffs' attempt to characterize the payroll lag as a diminution in wages that, in turn, evokes the protection of article XIII, section 2 of the Hawai'i Constitution and the *Yogi* case, the plaintiffs cite no authority for the proposition that delayed payments are equivalent to reduced payments, which would constitute a change in wages. Although other jurisdictions have had an opportunity to review their state-delayed compensation plans, none of them addressed the issue presented here on ap-

peal. Nevertheless, some of these cases are worthy of discussion to illustrate the distinction between payroll lag plans that resulted in employees' pay being delayed versus being withheld.

For example, in *Lincoln Fire Fighters Association, Local 644 v. City of Lincoln,* 198 Neb. 174, 252 N.W.2d 607 (1977), the City of Lincoln instituted a pay lag system for all city employees:

> Under this system[,] the 2–week pay period begins on a Thursday. Pay checks are issued on the second Friday following the completion of the pay period. The net result is that the payroll department has 7 working days to prepare the pay checks. *Rather than delaying pay checks for 7 work days, in order to convert to this new accounting system, the city withheld .7 of each city employee's biweekly pay checks, spread over eight pay periods. This money was placed in a pay lag fund to be paid out upon termination of employment.* The employee receives no interest on the money placed in the fund.

*Id.* at 609 (emphases added). The Supreme Court of Nebraska held that the pay lag system constituted "a change in wages[ ] and cannot be established unilaterally during the term of an operative contract." *Id.* at 609–10.

Similarly, *Association of Surrogates and Supreme Court Reporters Within the City of New York v. State of New York,* 940 F.2d 766 (2d Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992) (*Surrogates I* ), concerned a May 1990 statute set forth in 1990 New York Laws (N.Y.Laws), chapter 190, § 375, which authorized the state of New York to pay the affected employees nine

---

21. Although not relating to the subject of the payroll lag, *United Cerebral Palsy Associations of New York State, Inc. v. Cuomo,* 783 F.Supp. 43 (N.D.N.Y.), *aff'd,* 966 F.2d 743 (2d Cir.N.Y.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992), involved an analogous situation, where the New York State Department of Social Services initiated a "lag" in the reimbursement of Medicaid funds to certain health care providers, *i.e.,* delaying reimbursement two weeks longer than had been the previous practice. *Id.* at 45. The plaintiff-provider argued that the lag was a "withholding" and would have a devastating impact on its services to patients. *Id.* at 46–47.

The state contended that the adjustment was not a "significant change" because "it was budget neutral, affecting not the amount of Medicaid funds, but merely its allocation." *Id.* at 48. In declining to issue an injunction based upon the plaintiff's argument that the delayed payment was a taking, the United States District Court for the Northern District of New York held that "the delay is not a 'reduction' in payment; nor is it a 'limitation.' Plaintiff will be paid in full, . . . albeit received two weeks later than had been the practice prior to the implementation of the lag. Plaintiff's property interest has not been 'taken.' " *Id.* at 51 (footnote omitted).

days' salary, rather than ten, in each of ten successive two-week pay periods, resulting in ten days or two weeks' pay being withheld. *Id.* at 769. The withheld-pay was to be repaid to the employees upon the termination of their employment with the state at their then-applicable rate of pay. *Id.* This measure was expected to save the state approximately $7 million. The employees, however, were parties to collective bargaining agreements with the state that included the provision that "[b]i-weekly salaries will be computed on the basis of 10 working days." *Id.* at 770.

In holding that the measure was a substantial contractual impairment, the United States Court of Appeals for the Second Circuit reasoned that withholding an amount equal to ten percent of an employee's pay over a ten-week period could prevent the employee from meeting short-term financial obligations like mortgages, loans, credit card payments and the like. *Id.* at 771–72. The court also pointed out that payment to an affected employee of the money withheld could be postponed perhaps as long as forty-five years, if the employee devoted an entire career to government service. *Id.* The court rejected the state's contention that the substantial impairment was reasonable and necessary for the state's goals because "[t]he state could have shifted the seven million dollars from another governmental program, or it could have raised taxes." *Id.* at 773. The Second Circuit Court held that

> [t]he contract clause, if it is to mean anything, must prohibit New York from dishonoring its existing contractual obligations when other policy alternatives are available.... Were we to uphold this lag-payroll legislation, one wonders if the employees would ever receive their lagged wages, or whether another of the state's perennial "fiscal crises" ... would justify deferring again, or even cancelling, the lagged wages when they eventually become due.

*Id.* at 774 (citation omitted).

Subsequently, legislative amendments to New York's Finance Law, 1991 N.Y. Laws. chapter 166, § 382 and chapter 171, § 1, *reprinted in* N.Y. State Fin. Law. § 200(2–b)

(McKinney Supp.1992), were promulgated in an effort to save $10.7 million and offset anticipated state budget shortfalls for the fiscal year 1991–92. The measure permitted the state to pay employees for nine rather than ten days in each bi-weekly salary check over five payroll periods. The New York Court of Appeals, in *Association of Surrogates and Supreme Court Reporters Within the City of New York v. State of New York,* 79 N.Y.2d 39, 580 N.Y.S.2d 153, 588 N.E.2d 51 (1992), struck down the legislation based upon the rationale set forth in *Surrogates I,* holding that the impairment of contract was substantial. *Id.* at 54; *see also Condell v. Bress,* 983 F.2d 415 (2d Cir.) (holding that the salary deferral program, under which affected executive branch employees received only nine tenths of salary for each of five biweekly periods, was unconstitutional), *cert. denied,* 507 U.S. 1032, 113 S.Ct. 1851, 123 L.Ed.2d 474 (1993); *Quirk v. Regan,* 148 Misc.2d 300, 565 N.Y.S.2d 422 (N.Y.Sup.Ct. 1991) (holding that a change in the payment of salaries from one paycheck for ten workings days to one paycheck for nine working days may be implemented only after good faith negotiation).

Moreover, in *Massachusetts Community College Council v. Commonwealth,* 420 Mass. 126, 649 N.E.2d 708 (1995), the legislature enacted "a furlough program," wherein every state employee earning an annual salary of $20,000 or more was required to elect one of three options

> to be carried out between April 14, 1991, and June 30, 1991:(1) to take unpaid days off, unless the Governor designated the employee as a "critical and essential" employee[;] (2) to work without pay and receive bonus paid vacation days to be available after the beginning of the next fiscal year[;] or (3) to work without pay and receive a lump sum payment when his or her State employment terminated.

*Id.* at 711 (citation omitted). The Supreme Massachusetts Judicial Court struck down the furlough program, holding that the implementation of the program impaired the obligation of the state to pay compensation pursuant to the respective collective bargaining agreements. *Id.* at 716–17.

Obviously, these cases involved actual wage changes; none involved delays in payment without reduction in earned wages for the period worked. As indicated above, the Plaintiffs would receive their full paycheck for the preceding two weeks worked, albeit later than the previous practice under the predicted payroll system. Thus, the Plaintiffs' attempt to equate delayed payment with reduced payment is unpersuasive. The Act 355 amendment, which essentially alters the dates when public employees are to be paid, does not violate article XIII, section 2 of the Hawai'i Constitution nor HRS chapter 89 inasmuch as they do not prohibit a state employer from changing the pay dates of its employees. *See supra* Section III.A.3.a. Accordingly, we hold that the Act 355 amendment is not unconstitutional. We now turn to address whether the circuit court erred in determining that the implementation of the payroll lag after the stated-time schedule, *i.e.*, after 1998, is unauthorized and, thereby, in violation of the semimonthly payment requirement of HRS § 78–13.

**B.** *Imposition of HRS § 78–13(a) After the Specified Dates for Conversion*

■ The Plaintiffs maintain that the Defendants have no authority to implement a payroll lag for faculty members after the specific dates for the transition had passed because:

[HRS] § 78–13 specifies precise days and doesn't provide alternatives. It doesn't even hint that there are alternatives. Considering that the primary original motivation for the law was to cure budget problem in 1998—not 2002 or any other year—time must have been of the essence. There had to be one pay check withheld in [fiscal year 1998], or the proposed savings would not have been available as planned by the governor. Had the legislature wanted to allow a flexible schedule, in which dates would not be fixed[,] but rather would be dependent on time elapsed from an arbitrary or elective start point for the lag, that would have been easy to draft. The legislature could have left the initiation of the lag to the governor, and prescribed a date-shifting schedule based on

intervals between events, not precise dates.

The Defendants, however, argue that the statutory time frame in HRS § 78–13(a) is directive, not mandatory.

■ It is well-established that, where a statute contains the word "shall," the provision generally will be construed as mandatory. *See Leslie v. Bd. of Appeals of County of Hawai'i*, 109 Hawai'i 384, 393–94, 126 P.3d 1071, 1080–81 (2006); *Coon v. City & County of Honolulu*, 98 Hawai'i 233, 256, 47 P.3d 348, 371 (2002). In the present case, the traditional language signifying a mandatory provision, *i.e.*, the word "shall," is not used, but a word comparable in meaning and effect—"will"—is clearly present in HRS § 78–13. The word "will" is "an auxiliary verb commonly having the mandatory sense of 'shall' or 'must.' It is a word of certainty, while the word 'may' is one of speculation and uncertainty." Black's Law Dictionary 1598 (6th ed.1990); *see Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) (noting that this court "may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined") (citation and internal quotation marks omitted).

■ However, a statute containing generally recognized mandatory language may be found to be directory or discretionary, rather than mandatory, where it concerns only a time for performance. *State v. Himuro*, 70 Haw. 103, 105, 761 P.2d 1148, 1149 (1988).

In determining whether a statute is mandatory or directory, the intention of the legislature must be ascertained. *The legislative intent may be determined from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other. In general, a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them.*

*State v. Toyomura,* 80 Hawai'i 8, 20, 904 P.2d 893, 905 (1995) (quoting *Jack Endo Elec. Inc. v. Lear Siegler, Inc.,* 59 Haw. 612, 616–17, 585 P.2d 1265, 1269 (1978)) (other citation omitted) (emphasis added). Moreover,

> *[a] crucial difference between statutes considered directory and those deemed mandatory arises from the consequences of noncompliance. A failure to follow the former is unattended by serious legal consequences;* a neglect of the latter may invalidate a transaction or subject the transgressor to legal liabilities. 1A C. Sands, *Sutherland on Statutory Construction* § 25.03, at 298–99 (4th ed.1972); *County of Maui v. de[Do] Rego,* 24 Haw. 608, 615 (1919). Where there is a manifest necessity for strict compliance or a clear expectancy thereof, the provision is accorded mandatory status and the administrative agency's power to act may hinge upon precise adherence to the law. *Id.* Notice and hearing requirements are within the foregoing category because of obvious due process considerations. *Seemingly absolute time periods for administrative action, on the other hand, are often considered mere guides for the conduct of business with dispatch and for orderly procedure. They have generally been characterized as directory,* **unless** *time is of the essence of the act required, the statute contains negative language denying the exercise of authority beyond the period prescribed for action, or a disregard of the relevant provision would injuriously affect public interests or private rights. And the word "shall" [or "will"] may be held to be merely directory, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to the individual, by giving it that construction.*

*Perry v. Planning Comm'n of County of Hawai'i,* 62 Haw. 666, 676–77, 619 P.2d 95, 103 (1980) (citations and internal quotation marks omitted) (emphases added); *see also Cudal v. Sunn,* 69 Haw. 336, 342, 742 P.2d 352, 355–56 (1987). Stated differently, a statute specifying a time within which public officials are required to perform an act is directory unless the statute denies the exercise of power after such time, or the nature

of the act or the statutory language indicates that the time was intended to be a limitation. In evaluating whether a provision is to be accorded directory or mandatory effect, the objective of the court is to ascertain the legislative intent. *Himuro,* 70 Haw. at 105, 761 P.2d at 1149; *see also In re Water Use Permit Applications,* 94 Hawai'i 97, 147 n. 49, 9 P.3d 409, 459 n. 49 (2000).

In the instant case, there is no penalty imposed for the failure of the governor to comply with the specified schedule. Nothing in the statute suggests that the governor may not exercise his or her authority to convert from the predicted payroll system to an after-the-fact payroll system after the expiration of the time schedule. However, based upon an examination of the legislative history of HRS § 78–13, the specified schedule must be read as mandatory.

In 1997, the legislature recognized that

> the implementation of what is popularly referred to as the "payroll lag," and the changeover to the after-the-fact payroll system *are important components in improving the State's fiscal controls and balancing the budget.* For this reason, your Committee believes that the Legislature should take initiative in ensuring that *these important measures are implemented in a timely manner.*

Sen. Stand. Comm. Rep. No. 844, in 1997 Senate Journal, at 1225 (emphases added); Sen. Stand. Comm. Rep. 498, in 1997 Senate Journal, at 1097. The legislature also indicated that:

> *The purpose of this bill is to establish a* **specific schedule** *for implementing an after-the-fact payroll system.*

> Your Committee finds the law [Act 80] enacted last year that authorized the Governor to implement a payroll lag simply requires a one-year conversion time schedule. *Your Committee has replaced this generally stated requirement with* **a specific commencement date and schedule of pay dates to be delayed. These schedules shall be implemented** *unless otherwise provided by the Department of Accounting and General Services.*

Sen. Stand. Comm. Rep. No. 844, in 1997 Senate Journal, at 1225 (emphases added); Sen. Stand. Comm. Rep. 498, in 1997 Senate Journal, at 1097 ("Your Committee has replaced this generally stated requirement with a specific commencement date and a specific schedule of pay dates to be delayed."). Thus, the legislative history clearly demonstrates legislature's intention that the governor implement the after-the-fact payroll system "in a timely manner" and in accordance with "a specific schedule." Had the legislature intended to provide the governor with discretionary authority to enforce the payroll lag at any time, it would have left Act 80 intact. It did not, and, in fact, went as far as to painstakingly set forth a specific time schedule in the Act 355 amendment.

Moreover, it is undisputed that the Act 355 amendment was driven by fiscal exigency. The 1998 payroll lag was designed to create a savings of approximately $51 million by delaying the public employees' June 30, 1998 paycheck for fiscal year 1997–98. As the Plaintiffs argue, "the date the lag commenced was 'of the essence.' " The Defendants, on the other hand, maintain that, although "the $51 million savings was sought to occur via payroll lag in the 1998 fiscal year, there is nothing in the record to indicate that the need for savings would expire upon the implementation dates." The Defendants' contention, however, is disingenuous inasmuch as the record clearly indicates that the payroll lag's purpose was to save $51 million and that such savings were realized, as the Defendants concede, when the payroll lag was implemented as to all public employees (except for the UH faculty members) and UH's budget was cut by approximately $6.2 (the same amount that would have resulted from lagging the UH faculty's pay). Accordingly, it cannot be said that the objective of Act 355, which was to balance the budget, was not achieved. Consequently, we hold that the specific implementation dates set forth in HRS § 78–13 are mandatory.

Although not specifically argued, the Defendants allude to a "tolling" argument, stating that

> [the] Plaintiffs ignore the fact that the Governor has already implemented a pay-

lag for all State employees in accordance with Act 355, commencing on June 30, 1998. However, the Governor was prohibited from enforcing the provisions of Act 355 against the faculty members because of a federal injunction.

However, as previously discussed above, the State's inability to implement the payroll lag upon UH faculty did not prevent it from achieving the stated purpose of the lag, *i.e.,* saving $51 million by reducing the UH budget by $6.2 million (the same amount that would have been realized by lagging the UH faculty's pay). *See supra* note 10. Accordingly, notwithstanding the injunction and even assuming "tolling" occurred, we do not believe there is any sound reason for the governor to implement Act 355 upon the UH faculty members at this time when the expected savings has already been realized.

Accordingly, based upon the foregoing, we hold that the circuit court did not err (1) in concluding that "the exception from the twice-monthly requirement, found in [HRS § 78–13(a)], pertains to a payroll lag imposed in 1998, and is not available to Defendants" and (2) in issuing a permanent injunction.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the First Circuit Court's June 7, 2002 first amended judgment.

Concurring and Dissenting Opinion by ACOBA, J.

I agree with the majority's conclusion that the first circuit court (the court) did not err in issuing a permanent injunction. However, I disagree with the majority's analysis inasmuch as I believe that (1) Defendants–Appellants Russ K. Saito, in his capacity as Comptroller of the State of Hawai'i (the State) and Linda Lingle, in her capacity as Governor of the State [collectively, Defendants] are collaterally estopped from asserting that Plaintiffs–Appellees Alexander Malahoff, Linda Currivan, Diane Ferreira, Hugh Folk, Vincent Linares, David Miller, and University of Hawai'i Professional Assembly (UHPA) [collectively, Plaintiffs] are mistaken in equating the pay dates to " 'wages' [that] go to the

heart of collective bargaining[,]" (2) payroll delays, contrary to the majority's conclusion, are a core subject of collective bargaining, and (3) insofar as Act 355 precludes collective bargaining on payroll delays, it contravenes article XIII, section 2 of the Hawai'i Constitution, which provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law," and is therefore invalid.

## I.

### A.

As to the first point, this court has defined collateral estoppel as "an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in *a prior suit* on a different claim between the same parties or their privies[.]" *Dorrance v. Lee*, 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999) (emphasis in original) (quoting *Foytik v. Chandler*, 88 Hawai'i 307, 314–15, 966 P.2d 619, 626–27 (1998) (quoting *Morneau v. Stark Enters., Ltd.*, 56 Haw. 420, 423, 539 P.2d 472, 475 (1975))). *See also Keahole Def. Coalition, Inc. v. Bd. of Land & Natural Res.*, 110 Hawai'i 419, 429, 134 P.3d 585, 595 (2006) (stating that "collateral estoppel . . . 'applies to a subsequent suit between the parties or their privies on a *different* cause of action and prevents the parties or their privies from relitigating *any issue* that was actually litigated and finally decided in the earlier action' " (emphases in original) (citing *Dorrance*, 90 Hawai'i at 148, 976 P.2d at 909)); *Ellis v. Crockett*, 51 Haw. 45, 55, 451 P.2d 814, 822 (1969) (holding that "[c]ollateral estoppel . . . precludes the relitigation of a fact or issue which was previously determined in a prior suit on a *different claim* between the same parties or their privies" (emphasis added)).

The doctrine of res judicata also applies to administrative decisions. *See State v. Higa*, 79 Hawai'i 1, 8, 897 P.2d 928, 935 (1995) (stating that "[t]he doctrines of res judicata and collateral estoppel also apply to matters litigated before an administrative agency" (quoting *Santos v. State*, 64 Haw. 648, 653, 646 P.2d 962, 966 (1982))). It has been said that "[w]here a party does not appeal a final administrative decision[,] that decision becomes final and res judicata." *Hawkins v. State*, 183 Ariz. 100, 900 P.2d 1236, 1240 (Ct.App.1995) (citing *Guertin v. Pinal County*, 178 Ariz. 610, 875 P.2d 843, 845 (Ct.App. 1994)); *see also United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (noting that "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose" (citations omitted)). The doctrine of collateral estoppel "is based on the premise that a thorough fact-finding process was completed in the first proceeding." *Dorrance*, 90 Hawai'i at 147, 976 P.2d at 908 (quoting *Flynn v. Gorton*, 207 Cal.App.3d 1550, 255 Cal.Rptr. 768, 772 (1989)).

### B.

As the majority observes, in October 1999, UHPA "filed a prohibited practice complaint with the Hawai'i Labor Relations Board (HLRB), claiming that the implementation of the change in pay scheme [under Act 80] altered the terms and conditions of employment and that the anticipated change was subject to negotiation under Hawaii's collective bargaining laws." Majority op. at 174, 140 P.3d at 407. In response, the HLRB issued order No. 1402 (HLRB's order) noting that Defendants "filed a cross-motion for summary judgment seeking a determination that the implementation of an after-the-fact payroll [under Act 80] is nonnegotiable."

After considering the arguments presented in that proceeding the HLRB decided that *"payroll dates concern wages which are conditions of work and are mandatory subjects of bargaining because they have a significant effect on the employees' working conditions."* (Emphasis added.) Furthermore, the HLRB found as follows:

The [HLRB] notes that the semimonthly paydates for public officers and employees have remained constant for decades. The five-day pay adjustment will result in the delay in the payment of wages for affected public employees who will receive one less

paycheck in the calendar year in which the lag is implemented. The [National Labor Relations] Board finds that the employees who are on a strict budget or who have timely bills to pay will find a delay in pay dates to be a hardship.

The HLRB then concluded that "a delay in the receipt of wages resulting from the pay-lag ... *has a significant and material impact on the employees' working conditions in creating a financial hardship for the employees*[*,*]" and that "*[t]he lag will affect the compensation for the individual employees and the magnitude of the impact requires negotiations prior to the implementation of the payroll adjustment.*" (Emphases added.) The record does not indicate that Defendants appealed that adverse ruling by the HLRB. If this is the case, then as to the issue of the pay lag, res judicata would apply to the instant case inasmuch as "an administrative agency ... acting in a judicial capacity ... resolved disputed issues of fact ... which the parties ... had an adequate opportunity to litigate[.]" *Utah Constr.*, 384 U.S. at 422, 86 S.Ct. 1545.

### C.

Following the enactment of Act 355, which in effect, legislatively attempted to "overturn[ ] the [HLRB] decision that a payroll lag is negotiable," *Univ. of Hawaii Prof'l Assembly v. Cayetano*, 16 F.Supp.2d 1242, 1244 (D.Haw.1998) (*UHPA I* ), UHPA sought a preliminary injunction and declaration from the United States District Court for the District of Hawai'i (the district court) that Act 355 unconstitutionally impaired UHPA's collective bargaining agreement (CBA). *Id.* In that case, Defendants argued that UHPA and other plaintiffs "are not likely to succeed because there was no substantial impairment of the [CBA]." *Id.* at 1245.

Contrary to Defendants' position, the district court granted UHPA relief, finding the HLRB's reasoning as to Act 80 applicable and persuasive. *Id.* at 1245 n. 4. The district court concluded, *inter alia,* that "[t]he UHPA [CBA] includes the timing of payroll because it is material to the terms of employment and, at the time the [CBA] was negotiated, the timing of payroll was a negotiable

matter." *Id.* at 1249. Furthermore, it was pointed out that substantial hardship would likely be imposed by the enforcement of Act 355:

> Act 355 would likely substantially impair the [CBA] because *a five-day pay lag would likely impose a substantial hardship on many employees who would not be able to meet their financial obligations such as mortgage payments in a timely manner. Such employees may incur late fees and other penalties due to the pay lag. In some cases, a delay in payment of certain bills by even five days may affect a person's credit rating.*

*Id.* (emphasis added). In response to Defendants' argument that the pay dates were not a part of the CBA then existing, the district court stated that "[i]t is likely that the timing of the payment of each paycheck *is* included in the [CBA]." *Id.* at 1245 (emphasis added). The district court reasoned that "[t]he obligation of a contract is the law which binds the parties to perform their agreement," and thus, "the laws which existed at the time the contract was entered into and which affect its validity, construction, discharge and enforcement, in effect, are incorporated within the contract." *Id.* (citing *Lafortune v. Naval Weapons Ctr. Fed. Credit Union,* 652 F.2d 842, 846 (9th Cir.1981)).

In *Univ. of Hawaii Prof'l Assembly v. Cayetano,* 183 F.3d 1096, 1099 (9th Cir.1999) (*UHPA II* ), the United States Court of Appeals for the Ninth Circuit (the court of appeals) affirmed the district court's grant of a preliminary injunction. That court approved of the district court determination "that even in the absence of any explicit terms in the [CBA] regarding specific pay days, 'it is likely that the timing of the payment of each paycheck is included in the [CBA].' " *Id.* at 1102 (brackets omitted) (quoting *UHPA I,* 16 F.Supp.2d at 1245). The court of appeals elaborated by stating that "[f]or over twenty-five years, the State and its employees had a course of dealing under which it was understood that employees would be paid on the fifteenth and last days of every month. A course of dealing can create a contractual expectation." *Id.*

(citing *Stewart v. Brennan,* 7 Haw.App. 136, 142, 748 P.2d 816, 821 (1988)).

The court of appeals also approved of the district court's ruling that "the pay dates were material to the terms of employment and, at the time the [CBA] was negotiated, the timing of the payroll was a negotiable matter." *Id.* It added that, *"[u]nder [Hawai'i Revised Statutes] § 89–9(a), wages are a mandatory subject for good faith negotiation, and by implication, so also is the time for payment of wages." Id.* (emphasis added). Citing *Nat'l Labor Relations Bd. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the court of appeals stated that "employers may not unilaterally implement changes on bargainable topics." *UHPA II,* 184 F.3d at 1102.

The court of appeals in *UHPA II* explained that the ruling in *UHPA I* was "consistent with the law on the interpretation of [CBA]s." *Id.* It decided as follows:

> In construing a [CBA], not only the language of the agreement is considered, but also past interpretations and past practices are probative. *We consider an employer's past practices because the [CBA] states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The custom and practice of the State had been to pay its employees on the fifteenth and last days of each month. That was the status quo at the time the [CBA] was entered into.*

*Id.* (emphasis added) (internal citations, quotation marks, and brackets omitted). According to the court of appeals, "the timing of payment *is* part of the [CBA]." *Id.* (emphasis added).

Hence, the issue of whether pay dates are a core subject of collective bargaining has already been decided upon, not only once, before the HLRB (apparently without appeal therefrom), but also by the district court and on appeal of that decision to the court of appeals. Consistent therefore with this court's previous decision in *Dorrance,* Defendants are precluded from litigating the issue of whether pay dates are a core subject of bargaining, that issue having been "previously determined in a prior suit on a different claim between the same parties or their privies." 90 Hawai'i at 148, 976 P.2d at 909 (emphasis omitted).

## II.

Despite the foregoing history of the pay lag controversy, the majority states that the collateral estoppel doctrine is "inapplicable," majority op. at 181–82, n. 16, 140 P.3d at 414–15, n. 16. I respectfully disagree. First, as pointed out, the HLRB, as an administrative agency, acted "in a judicial capacity and resolved disputed issues of fact [or issue,]" *Utah Constr.,* 384 U.S. at 422, 86 S.Ct. 1545, on the matter of whether pay dates are a core subject of collective bargaining. Second, it is immaterial that "the HLRB's decision was based upon the Act 80 amendment," as the majority asserts. Majority op. at 181–82, n. 16, 140 P.3d at 414–15, n. 16. As stated, collateral estoppel applies despite the fact that a *different* cause of action was addressed in the prior proceedings. The critical inquiry is whether the same disputed fact or issue was addressed in the prior proceedings and not whether the same legislative act is in question. It cannot be disputed that the same pay lag issue was addressed in the HLRB proceeding. Third, it appears that the HLRB's decision was not appealed by Defendants and therefore "bec[a]me[ ] final and res judicata." *Hawkins,* 900 P.2d at 1240.

Apparently to distinguish the HLRB proceedings from the present one, the majority states, quoting the HLRB's order, that "the HLRB specifically relied upon the fact that 'the unambiguous language of the statute ... does not make reference to or supersede [HRS c]hapter 89.' "[1] Majority op. at 181–82,

---

[1] The majority cites to this language in the Hawai'i Labor Relations Board's January 17, 1997 order No. 1402 which granted summary judgment in favor of University of Hawai'i Professional Assembly (UHPA). In order to provide context to that citation, the full paragraph of that citation is quoted as follows:

> Based upon a review of the relevant legislative history, clearly the purpose for Act 80 was to minimize salary overpayments and to result in a one-time savings of approximately $47,000,000. The [HLRB] agrees with [Plaintiff UHPA] however, that it is difficult to ascer-

n. 16, 140 P.3d at 414–15 n. 16 (ellipses points in original). In fact, this statement, taken in context, confirms the board's belief that chapter 89 did apply to the pay lag issue. In ruling for the Plaintiffs, the board expressly found that "[Defendants] frustrated the bargaining process and their actions were wilful as the natural consequence of the *[Defendants'] refusal to negotiate was the deprivation of the [UHPA's] and [Plaintiffs-employees'] rights guaranteed under HRS [c]hapter 89.*" (Emphasis added.) The HLRB also concluded that "[Defendants'] actions constitute a refusal to bargain in good faith *in violation of [HRS] § 89–13(a)(5)*[.]" (Emphasis added.)

As the majority recognizes, in an attempt to remove Act 355 from the proscriptions of HRS chapter 89, and presumably because of the HLRB's adverse decision, the legislature qualified Act 355 to state that "[t]he implementation of the after-the-fact payroll shall not be subject to negotiation under [HRS] chapter 89." Majority op. at 181–82 n. 16, 140 P.3d at 414–15 n. 16 (quoting HRS § 78–13 (Supp.2005)). But a legislative pronouncement that the payroll lag was not negotiable under HRS chapter 89 must still pass constitutional muster, as discussed *infra. See Del Rio v. Crake,* 87 Hawai'i 297, 304, 955 P.2d 90, 97 (1998) (stating that "a legislature's subsequent assertion that it in fact intended to enact an unconstitutional statute does not thereby cause that statute to pass constitutional muster" and that "the question as to the constitutionality of a statute is not for legislative determination, but is vested in the judiciary, and a statute cannot survive constitutional challenge based on legislative declaration alone").

As noted previously, the district court and the court of appeals [collectively, the federal courts] determined that payroll dates involve a core subject of collective bargaining. Despite the different causes of action brought before the federal courts and the court, the

application of the collateral estoppel doctrine applies because the same pay lag issue decided by the court had already been decided in the federal courts. Moreover, the fact that subsequent to the issuance of the HLRB's decision the legislature included language in Act 355 that "[t]he implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89" does not foreclose inquiry into whether Act 355 meets constitutional muster or a determination on whether a delay in pay roll dates continues to be a subject of collective bargaining despite this pronouncement.

Focusing on the different causes of action, the majority attempts to differentiate the present appeal from the proceedings before the federal courts on the ground that "Plaintiffs sought a preliminary injunction ... based upon their allegations that Act 355 violated the Contract Clause of the United States Constitution—and not article XIII, section 2 of the Hawai'i Constitution[.]" Majority op. at 181–82 n. 16, 140 P.3d at 414–15 n. 16. Again, this distinction is immaterial inasmuch as collateral estoppel, as earlier stated, applies despite the fact that a cause of action in the first instance differs from the second one.

Obviously, a violation of the Hawai'i Constitution was not before the federal courts. Nonetheless, as earlier discussed, the issue of whether the delay in pay dates is a subject of collective bargaining was fully litigated before the district court by the same parties involved in the present case. The district court ruled in favor of Plaintiffs and Defendants appealed that ruling. To reiterate, the issue was fully litigated by the same parties on appeal, and again Plaintiffs prevailed. In both instances, the federal courts explained their decision in detail. Hence, having litigated the pay lag issue, albeit under a "different claim," *Ellis,* 51 Haw. at 55, 451 P.2d at 822, collateral estoppel applies.

tain whether the legislature intended the paylag to be negotiable or non-negotiable. As such, the [HLRB] relies upon the unambiguous language of the statute which does not make reference to or supersede HRS [c]hapter 89[.] *When the statutes are read together then, the [HLRB] concludes that [Defendants] may imple-*

*ment a paylag but must comply with bargaining obligations imposed by [HRS c]hapter 89[.] The issue before the [HLRB] then, is whether under the provisions of [HRS] [c]hapter 89, the paylag is negotiable.* (Emphasis added).

### III.

### A.

Finally, the majority appears to adopt a rule that the "grant of a preliminary injunction is 'not a final judgment sufficient for collateral estoppel purposes.'" Majority op. at 181–82 n. 16, 140 P.3d at 414–15 n. 16 (quoting *Starbuck v. City & County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir. 1977)) (other citations omitted). However, it has also been said that the rule that a "grant of a preliminary injunction is 'not a final judgment sufficient for collateral estoppel purposes'" is not an absolute one for "[g]enerally, preliminary orders do not have a preclusive effect, but 'that is not always true; if a case does not go all the way to judgment, a preliminary injunction issued in it may be given collateral estoppel effect in future litigation between the parties.'" *Ocean Conservancy v. Nat'l Marine Fisheries Serv.,* 416 F.Supp.2d 972, 979 (D.Haw.2006) (quoting *Gjertsen v. Bd. of Election Comm'rs of the City of Chicago,* 751 F.2d 199, 202 (7th Cir.1984)). As has been stated, "[f]inality for purposes of issue preclusion is a more pliant concept than it would be in other contexts ... [and a] final judgment with respect to issue preclusion includes *any prior adjudication of an issue in another action between the parties that is determined to be sufficiently firm to be accorded conclusive effect.*" *Dyndul v. Dyndul,* 620 F.2d 409, 412 (3d Cir.1980) (emphasis added) (parentheses and internal quotation marks omitted).

The majority concedes that the rule is not an absolute one for "the grant or denial or a preliminary injunction 'will be given preclusive effect if it is necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits[.]'" Majority op. at 181–82 n. 16, 140 P.3d at 414–15 n. 16 (quoting *Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 995 (7th Cir.1979)). The majority further concedes that "'findings made in granting or denying preliminary injunctions can have preclusive effect if the circumstances make it likely that the findings are "sufficiently firm" to persuade the court that there is no compelling reason for permitting them to be

litigated again.'" *Id.* at 182 n. 16, 140 P.3d 415 n. 16 (quoting *Hawksbill Sea Turtle v. FEMA,* 126 F.3d 461, 471 n. 11 (3d Cir. 1997)).

While the majority cites to cases for the proposition that findings made in a prior proceeding may have preclusive effect under the doctrine of collateral estoppel when said findings are "sufficiently firm," that proposition applies with equal force as to issues of law. The Restatement (Second) of Judgments applies the general rule of collateral estoppel or issue preclusion in the following manner:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim.

*Restatement (Second) of Judgments* § 27 (1982) [hereinafter, *Restatement* ]. Thus, "[f]or a judgment to be 'final' for purposes of issue preclusion, it must be 'sufficiently firm' to be accorded conclusive effect." *Still v. Michaels,* 791 F.Supp. 248, 251 (D.Ariz.1992). For purposes of collateral estoppel, then, "'final judgment' *includes* any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Restatement,* § 13 (emphasis added); *see also Gonzalez Pina v. Rodriguez,* 278 F.Supp.2d 195, 203 (D.P.R. 2003) (observing that "[a] final judgment in the traditional sense is not essential to the applicability of issue preclusion" but merely "requires that the earlier adjudication [be] sufficiently firm to be accorded conclusive effect").

The *Still* court added that "[a] judgment is 'sufficiently firm' where the parties were fully heard, the court supported its decision with a reasoned opinion, and the decision was subject to appeal or was in fact reviewed on appeal." 791 F.Supp. at 251 (citing *In re Lockard,* 884 F.2d 1171, 1175 (9th Cir.1989)); *see also Restatement* § 13, cmt. g (listing as factors in determining finality of a judgment for the purpose of preclusion that (1) "the parties were fully heard," (2) "the court supported its decision with a reasoned opinion,"

and (3) "the decision was subject to appeal or was in fact reviewed on appeal"). The Ninth circuit court in *Lockard* also noted that the "final judgment" requirement is somewhat more relaxed for purposes of "issue preclusion" than it is for purposes of "claim preclusion." 884 F.2d at 1175.

### B.

Yet the majority asserts that "the federal preliminary injunction and the Ninth Circuit's subsequent affirmance are clearly not 'sufficiently firm' to merit preclusive effect inasmuch as the U.S. district court ultimately dismissed the preliminary injunction—*not on the merits*—but as moot in light of changed circumstances, *i.e., the expiration of the Plaintiffs' [CBA]*." Majority op. at 182 n. 16, 140 P.3d at 415 n. 16 (emphases added). The majority goes on to assert that "the U.S. district court dissolved the injunction and dismissed the case, clearly expressing its intention that future litigation should not be collaterally estopped." *Id.*

With all due respect, the majority is incorrect as to its mootness analysis and therefore simply wrong in its conclusion that the district court indicated a "clear express[ion]" that future litigation should not be collaterally estopped. The opinions of the federal courts are devoid of any language indicating that future litigation should not be collaterally estopped. In the absence of any express language in the opinion of the district court, this assertion is erroneous. Mere dismissal of the case before the district court does not amount to a clear expression of an intention to prevent the application of collateral estoppel.

First, it has been held that a case is moot "when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Lum v. City & County of Honolulu,* 732 F.Supp. 1070, 1072 (D.Haw.1990) (quoting *Fed. Sav. & Loan Ins. Corp. v. Dir. of Revenue,* 650 F.Supp. 1217, 1220 (N.D.Ill.1986)). In the present matter, the question before the federal courts was whether Defendants violated Plaintiffs' rights under the Contracts Clause of the United States Constitution. As noted, the preliminary injunction was dissolved by the district court on the narrow ground that Plaintiffs no longer had any contract relationship with Defendants following expiration of the CBA. Therefore, inasmuch as relief under the Contracts Clause could not "have any practical effect" upon the expiration of the parties' CBA, the district court dissolved its earlier order granting preliminary injunction. Simply because the Plaintiffs' cause of action before the federal courts became moot did not undermine those courts' rulings and rationale insofar as the issue of pay dates being a core subject of collective bargaining is concerned. The district court's decision merely indicated that, upon the expiration of the CBA between the parties, no further enforcement was necessary.[2] Because those courts' decisions are sufficiently firm for the purpose of issue preclusion, Defendants are collaterally estopped from relitigating that same issue.

---

2. In seeking dissolution of the preliminary injunction before the U.S. district court, Defendants attempted to argue that "even if the [collective bargaining agreement (CBA)] terms are still in effect during negotiations, they may make a unilateral change (in Plaintiffs' pay dates) because the topic of pay dates is now non-negotiable under Act 355." *University of Hawai'i Professional Assembly v. Cayetano,* 125 F.Supp.2d 1237, 1242 (D.Haw.2000). In rejecting that argument the U.S. district court stated that the cases cited by the Defendants in support of that proposition is "irrelevant to the issue of whether the injunction should be retained or vacated." *Id.* at 1243. The district court also noted as follows:

A potential flaw in Defendants' logic is that to the extent the CBA terms are still in effect pending negotiation, one term of the CBA is that the payroll lag is negotiable. This fact was central to [the district court's] holding. The [district court] need not resolve this issue, however, because as explained above, the unilateral change doctrine has nothing to do with whether Plaintiffs' *contract* rights under the CBA remain.

*Id.* at 1243 n. 6 (emphasis in original). As stated by that court, "[t]he only question before [the district court] is whether there are still *enforceable* contract rights between the parties." *Id.* at 1243 (emphasis added). Accordingly, that court's dissolution of the preliminary injunction is based on the ground that Plaintiffs no longer had any contract relationship with Defendants following expiration of the CBA between the parties, and, thus, the Contracts Clause of the United States Constitution was no longer implicated.

Second, as the majority concedes, the dissolution of the preliminary injunction was based on mootness and not decided "on the merits." Majority op. at 182 n. 16, 140 P.3d at 415 n. 16. It has been said that for purposes of preclusion, "[t]he term 'on the merits' is a term of art and does not necessarily mean that the issues were actually litigated." *In re Gilson*, 250 B.R. 226, 236 (Bankr.E.D.Va.2000). Moreover, "[a] judgment on the merits is one which is based on legal rights as distinguished from mere matters of practice, procedure, jurisdiction or form." *Id.* (quoting *Fairmont Aluminum Co. v. Comm'r of Internal Revenue Serv.*, 222 F.2d 622, 625 (4th Cir.1955)). Because the district court, in terminating the preliminary injunction against the Defendants did not address the merits of the case, it did not purport to render meaningless its previously rendered reasons for, or the substance of, its grant of preliminary injunction.

Third, it follows, then, that mootness does not preclude the application of the collateral estoppel doctrine. Whether a prior proceeding was rendered moot is not controlling in determining whether a ruling made in the prior proceeding is sufficiently firm. Rather, for collateral estoppel to apply, the only requirements are that "the parties were fully heard, the court supported its decision with a reasoned opinion, and the decision was subject to appeal or was in fact reviewed on appeal." *Still*, 791 F.Supp. at 251. As earlier noted, the parties involved in the federal preliminary injunction action are the same as the parties involved in the matter before this court. The issue of whether collective bargaining encompasses the alteration of pay dates was fully litigated by the parties before the district court and the court of appeals. The same statute, Act 355, was at issue. Both federal courts reached the conclusion that the delay in pay dates is a core subject of collective bargaining. Both federal courts also ruled favorably for Plaintiffs.

Thus, the instant case fits squarely within the rule that "a preliminary injunction issued in [a given case] may be given collateral estoppel effect in future litigation between

the parties." *Ocean Conservancy*, 416 F.Supp.2d at 979. The determinations by the district court as to the delay in pay dates, coupled with the court of appeals's subsequent affirmance, is "sufficiently firm to be accorded conclusive effect." *Dyndul*, 620 F.2d at 412. Applying the test as stated in *Still* and *Lockard*, it is clear that the parties were fully heard by both the district court and the court of appeals, each federal court supported their decisions with well-reasoned opinions, and the district court's opinion was reviewed on appeal and subsequently affirmed. Hence, contrary to the majority's position, the detailed decisions of the district court and court of appeals establish that the prior adjudications of the pay lag question were "sufficiently firm to be accorded conclusive effect." *Id.*

To reiterate, findings made in a grant or denial of an application for a preliminary injunction may be given preclusive effect "if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again." Majority op. at 182 n. 16, 140 P.3d at 415 n. 16 (quoting *Hawksbill*, 126 F.3d at 474 n. 11). Here, the determination of whether payroll dates is a negotiable matter was made by the HLRB, the district court, and the court of appeals. In all three proceedings, that determination was made in favor of Plaintiffs. It appears that this determination was made after the parties were given a full opportunity to litigate the matter. Defendants do not advance a compelling reason for relitigating the issue in this appeal. There is no indication in the record that the tribunals involved made erroneous findings. The circumstances thus demonstrate that "the findings are accurate [and] reliable[.]" *Hawksbill*, 126 F.3d at 474 n. 11; majority op. at 182 n. 16, 140 P.3d at 415 n. 16.

Hence, although the federal cases did "not go all the way to judgment, a preliminary injunction issued in [the cases] may be given collateral estoppel effect in future litigation between the parties." *Ocean Conservancy*, 416 F.Supp.2d at 979.[3] The parties were

---

**3.** Although I cite to *Ocean Conservancy v. Nat'l Marine Fisheries Serv.*, 416 F.Supp.2d 972, 979

(D.Haw.2006) for the general proposition that an order or grant of a preliminary injunction may

afforded a full and fair opportunity to litigate the issue of whether collective bargaining encompasses the imposition of a delay in pay dates under Act 355. In the proceedings before the HLRB and the federal courts, the legal rights of Plaintiffs, particularly their right to bargain over pay dates, had been decided favorably with sufficient finality.

## IV.

Turning to the second point to be made, the majority's conclusion that "it can hardly be said that the payroll delay evades one of the core subjects of collective bargaining, *i.e.*, wages[,]" majority op. at 189, 140 P.3d at 422, cannot be sustained, given the factual background of the instant case. The majority apparently approves of Defendants' argument that "each employee, following a payroll lag, will be paid the same amount of money for the same amount of work[,]" in stating that "Plaintiffs would receive their full paycheck for the preceding two weeks worked, albeit later than the previous practice under the predicted payroll system," *id.* at 191, 140 P.3d at 424, and in concluding that "the Plaintiffs' attempt to equate delayed payment with reduced payment is unpersuasive[,]" *id.* at 189, 140 P.3d at 422. The conclusion the majority arrives at runs contrary to the findings made by the HLRB and the federal courts that pay dates are material to collective bargaining. As the court of appeals held:

> [The] Plaintiffs are wage earners, not volunteers. They have bills, child support obligations, mortgage payments, insurance premiums, and other responsibilities. [The] Plaintiffs have the right to rely on the timely receipt of their paychecks. Even a brief delay in getting paid can

cause financial embarrassment and displacement of varying degrees of magnitude.

*UHPA II*, 183 F.3d at 1106.

Therefore, contrary to the majority's assertion that no injury would result because pay wages will "only be[ ] delayed," majority op. at 189, 140 P.3d at 422, it has already been decided between these parties that "payroll dates *concern wages which are conditions of work and are mandatory subjects of bargaining because they have a significant effect on the employees' working conditions* [,]" as noted by the HLRB, and that injury would occur. The majority's contention also runs contrary to the express findings of the court in its Order Denying Defendants' Motion for Judgment on the Pleadings and Order Granting Plaintiffs' Cross–Motion for Summary Judgment, that state as follows:

> ■ Imposition of a payroll lag on [UH] faculty, by means of a one-time, once a month paycheck, would deprive [the] faculty [members] of one paycheck in the month and year of implementation, or 50% of their salary in the month of implementation and 1/24 of their salary in the year of implementation.

> ■ *This loss of income would have material and significant effect on the faculty, especially the lower-paid faculty.* Such a pay loss would be of a magnitude comparable to other issues that triggered the UHPA strike of 2001. *A payroll lag would likely impose a substantial hardship on employees, who might not be able to meet their financial obligations, such as mortgage payments or court-ordered child support payments, in a timely manner. Employee contributions to benefit funds*

be given preclusive effect, the majority also relies on this case by quoting the following language in support of its proposition that the determinations made by the federal courts are not sufficiently firm:

> [I]t is possible that a court may decide that a prior ruling need not be vacated because there is no possibility that it will have any collateral consequences. Although this approach is tempting, it should be easier to vacate than to make a responsible determination that there is indeed no risk of future consequences. In contrast, a court may be tempted to conclude

that its findings might warrant preclusive effect in later litigation, and refuse to vacate so that later courts can employ preclusion if it seems appropriate. . . .

Majority op. at 182 n. 16, 140 P.3d at 415 n. 16 (quoting *Ocean Conservancy*, 416 F.Supp.2d at 979) (other citations omitted). I note that the *Ocean Conservancy* court made this statement in the context of a federal court vacating its own prior ruling. Thus, it appears that this proposition is inapplicable to the instant case inasmuch as no vacatur was involved with the federal courts' dispositions.

*that depend on receipt of a paycheck could be delayed, in some cases requiring the employees to dip into savings—if any—to maintain timely payments. Faculty may also incur late fees and other penalties due to pay lag. . . .*

(Emphases added.) Defendants did not challenge the court's findings that injury would occur to Plaintiffs if the pay lag was imposed. The court's findings in this regard then must not be disturbed and, thus, the majority is incorrect. *See Nakasone v. Nakasone,* 102 Hawai'i 177, 181, 73 P.3d 715, 719 (2003) (explaining generally that "[u]nchallenged findings are binding on appeal" (quoting *Poe v. Hawaii Labor Relations Bd.,* 97 Hawai'i 528, 536, 40 P.3d 930, 938 (2002))).

## V.

Because it is established that the time of payment is part of the conditions of employment and "mandatory subjects of bargaining," holding otherwise would contravene article XIII, section 2 and the precepts established in *United Pub. Workers, AFSCME v. Yogi,* 101 Hawai'i 46, 62 P.3d 189 (2002). It was recognized in *Yogi* that article XIII, section 2 was ratified with the understanding that collective bargaining "entail[s] the ability to engage in negotiations concerning core subjects such as *wages, hours, and other conditions of employment.*" *Id.* at 53, 62 P.3d at 196 (emphasis added).

By the terms of Act 355, the legislature precluded the issue of pay dates from collective bargaining under HRS chapter 89. *See* HRS § 78–13 (stating that "[t]he implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89"). Act 355 purportedly grants the legislature absolute discretion in defining the scope of collective bargaining, contrary to the principles under *Yogi.* But, "[a] legislative enactment purporting to authorize that which is unconstitutional cannot stand." *State v. Morris,* 72 Haw. 67, 76, 806 P.2d 407, 412 (1991).

In *Yogi,* it was said that "[g]ranting the lawmakers absolute discretion to define the scope of collective bargaining would also produce the absurd result of nullifying the 'right to organize for the purpose of collective bargaining[,]' " as that phrase is used in article XIII, section 2. 101 Hawai'i at 53, 62 P.3d at 196 (citation omitted). Inasmuch as pay dates are a "core subject of collective bargaining," and Act 355, by its terms, impinges on such a subject because it would nullify the right to collective bargaining on such a matter, I would hold, therefore, that the application of Act 355 would infringe upon Plaintiffs' right to organize for the purpose of collective bargaining under article XIII, section 2. Thus I would affirm the court's permanent injunction, but for the reasons stated above.